No. 114,153

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HODES & NAUSER, MDS, P.A.;
HERBERT C. HODES, M.D.; and
TRACI LYNN NAUSER, M.D.,
*Appellees*,

v.

DEREK SCHMIDT,
in His Official Capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE,
in His Official Capacity as
District Attorney for Johnson County,
*Appellants.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed January 22, 2016. Affirmed by an equally divided court.

*Stephen R. McAllister*, solicitor general, *Shon D. Qualseth*, and *Sarah E. Warner*, of Thompson Ramsdell Qualseth & Warner, P.A., of Lawrence, *Jeffrey A. Chanay*, chief deputy attorney general, and *Dennis D. Depew*, deputy attorney general, for appellants.

*Erin Thompson*, of Thompson Law Firm, LLC, of Wichita, *Robert V. Eye* and *Brett A. Jarmer*, of Robert V. Eye Law Office, LLC, of Lawrence, *Teresa A. Woody*, of The Woody Law Firm PC, of Kansas City, Missouri, and *Janet Crepps*, *Genevieve Scott*, and *Zoe Levine*, of Center for Reproductive Rights, of New York, New York, for appellees.

*Kevin M. Smith*, of Law Offices of Kevin M. Smith, P.A., of Wichita, and *Paul Benjamin Linton*, of Thomas More Society, of Northbrook, Illinois, for *amicus curiae* The Family Research Council.

*Frederick J. Patton II*, of Topeka, for *amicus curiae* Kansans for Life, Inc.

*Mark P. Johnson*, of Dentons US LLP, of Kansas City, Missouri, for *amici curiae* Kansas Physicians.

*Don Saxton*, of Saxton Law Firm LLC, of Kansas City, Missouri, and *Kimberly A. Parker*, *Skye L. Perryman*, *Brittani Kirkpatrick Ivey*, and *Souvik Saha*, of Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C., for *amicus curiae* American College of Obstetricians and Gynecologists.

EN BANC

LEBEN, J.: The 2015 Kansas Legislature passed a bill, signed into law by Governor Sam Brownback, that outlawed the most common method of second-trimester abortions. Before the law's July 1 effective date, a state district court entered a temporary injunction that kept the law from taking effect.

The district court based its order on provisions of the Kansas Constitution Bill of Rights, concluding that they provide the same right to abortion as the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The State has appealed, contending that there is no abortion right under the Kansas Constitution.

But the Kansas Supreme Court has said for nearly a century that sections 1 and 2 of the Kansas Constitution Bill of Rights have "much the same effect" as the Due Process and Equal Protection Clauses of the United States Constitution. *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005); *State ex rel. Stephan v. Parrish*, 257 Kan. 294, Syl. ¶ 5, 891 P.2d 445 (1995); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981); *Manzanares v. Bell*, 214 Kan. 589, 602, 522 P.2d 1291 (1974); *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974); *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, Syl. ¶ 1, 408 P.2d 877 (1965); *State v. Wilson*, 101 Kan. 789, 795-96, 168 Pac. 679 (1917). And a right to abortion has been recognized under the Due Process Clause of the Fourteenth Amendment to the United States Constitution for more than 40 years. *Roe v. Wade*, 410 U.S. 113, 153, 93 S. Ct. 705, 35 L.

2

Ed. 2d 147 (1973). We therefore conclude that sections 1 and 2 of the Kansas Constitution Bill of Rights provide the same protection for abortion rights as the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the district court correctly determined that the Kansas Constitution Bill of Rights provides a right to abortion.

The State also argues that even if Kansas had such a right, the new Kansas statute would not unduly burden women seeking to exercise that right. But the United States Supreme Court held in *Stenberg v. Carhart*, 530 U.S. 914, 938, 945-46, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000), that a Nebraska statute that outlawed both the type of abortion at issue here and another less-common procedure unduly burdened abortion rights and was unconstitutional. Kansas already bans the less-common procedure, so the new law would put Kansas in the same position as Nebraska before its statute was found to be unconstitutional. Based on *Stenberg*, there is a substantial likelihood that the Kansas statute is unconstitutional, so the district court properly entered a temporary injunction.

FACTUAL AND PROCEDURAL BACKGROUND

The legislature called the law at issue here the Kansas Unborn Child Protection from Dismemberment Abortion Act. With limited exceptions, the statute would ban what the medical profession calls a "dilation and evacuation" or "D & E" abortion, the primary method for second-trimester abortions in the United States. K.S.A. 2015 Supp. 65-6741 *et seq.*; L. 2015, ch. 22. The plaintiffs, two board-certified obstetrician-gynecologists and their medical practice, seek to continue performing D & E abortions. The plaintiffs perform abortions only up to 21.6 weeks from the woman's last menstrual period, which means that the fetus is not yet viable, *i.e.*, able to survive outside the womb. See *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, Syl. ¶ 4, 128 P.3d 364 (2006).

Because we are reviewing a law that seeks to ban an abortion method and because the State defends that law in part by arguing that alternative methods are available, we must describe and discuss abortion procedures. Faced with the same task, Justice Stephen G. Breyer provided these introductory comments, with which we agree:

"Considering the fact that [these] procedures seek to terminate a potential human life, our discussion may seem clinically cold or callous to some, perhaps horrifying to others. There is no alternative way, however, to acquaint the reader with the technical distinctions among different abortion methods and related factual matters, upon which the outcome of this case depends." *Stenberg*, 530 U.S. at 923.

We will start by describing two abortion procedures—D & E and a variant called intact D & E, both described in the Supreme Court's *Stenberg* opinion. D & E is the most common method, used in about 95% of second-trimester abortions (about 10% of all abortions performed in the United States are done in the second trimester). In this procedure, the physician dilates the cervix and uses surgical instruments to remove the fetus by pulling it "through the cervix into the birth canal." 530 U.S. at 925. Put bluntly, if the fetus is too large to fit through the cervix, friction against the cervix causes the fetus to tear apart. Performing this D & E procedure on a living, though nonviable, fetus (as commonly done) would be banned by the Kansas statute at issue here. K.S.A. 2015 Supp. 65-6742(b)(1); K.S.A. 2015 Supp. 65-6743(a); L. 2015, ch. 22, secs. 2-3.

Although D & E is quite safe for the woman, it does carry some risks, like any medical procedure. For example, as the fetus tears, sharp bone fragments can cause accidental uterine perforations. In addition, the more times an instrument passes into the uterus, the greater the risk of infections or perforations caused by the instrument. To reduce these risks, some doctors at one time preferred using the intact D & E procedure. In that method, the doctor pulls the fetus through the cervix intact by collapsing the skull. Kansas has banned the intact D & E abortion procedure (also called a partial-birth

4

abortion) since 1998. See K.S.A. 2014 Supp. 65-6721; L. 1998, ch. 142, sec. 18; L. 2011, ch. 91, sec. 30.

As part of its argument that the new Kansas statute does not violate any abortion right a woman might have, the State contends that the statute does not unduly burden that right—or make it too difficult to exercise—since alternative abortion methods would still be available. More specifically, the State has suggested three alternatives to the standard D & E procedure: labor-induction abortion, inducing fetal demise with digoxin injections, and inducing fetal demise by cutting the umbilical cord (also known as transection). A labor-induction abortion uses a combination of drugs that induce labor and delivery of the nonviable fetus. See *Planned Parenthood of Southwest Ohio Region v. DeWine*, 696 F.3d 490, 494-95 (6th Cir. 2012). The other options (inducing fetal demise by digoxin or transection) would add additional procedures onto the D & E abortion so that fetal demise occurs before the fetus is removed. If the fetus is no longer alive when the doctor proceeds with the D & E procedure, that would not violate the new Kansas statute, which forbids dismemberment only when it involves "a living unborn child." K.S.A. 2015 Supp. 65-6742(b)(1); L. 2015, ch. 22, sec. 2.

This case has reached us after the entry of a temporary injunction, which often must be considered in a short time period. That was true here: the statute was signed by the Governor on April 7, 2015; the case was filed on June 1; and the district court had to consider whether to prevent the statute from taking effect on July 1. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); see also *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007). Accordingly, requests for temporary injunction are often considered based on written testimony submitted by the parties. See K.S.A. 60-902. Here, the plaintiffs submitted written testimony from three physicians: Dr. Traci Lynn Nauser, one of the plaintiffs and a board-certified obstetrician-gynecologist; Dr. Anne Davis, a

board-certified obstetrician-gynecologist and an associate professor at the Columbia University Medical Center in New York City; and Dr. David Orentlicher, who has both a medical degree and a law degree and serves as both a professor of law at the Robert H. McKinney School of Law at Indiana University and an adjunct professor of medicine at the Indiana University School of Medicine.

The State did not submit any written testimony to the district court, and it did not seek to present any witnesses at the hearing held by the district court on the plaintiffs' request for a temporary injunction. Instead, the State cited some articles from medical literature in its brief to the district court; the State cites some of those again on appeal.

It does not appear, however, that the State has properly challenged any of the district court's factual findings in this appeal. The State's appellate brief raises two legal issues but does not claim that the district court's factual findings are unsupported by substantial evidence. Although the State's reply brief purports to challenge some of the district court's factual findings (by citing medical literature referenced in its district court brief), new issues cannot be raised in a reply brief. See *State v. McCullough*, 293 Kan. 970, 984-85, 270 P.3d 1142 (2012).

Even if the State had properly challenged the district court's factual findings in this appeal, we would reject that challenge. "In cases in which a trial court's decision regarding an injunction is based on disputed facts, . . . we . . . look at whether the factual basis for its decision is supported by sufficient evidence." *State Bd. of Nursing v. Ruebke*, 259 Kan. 599, 611, 913 P.2d 142 (1996). The district court's factual findings are fully supported by the written testimony submitted by the plaintiffs, and those factual findings provide sufficient support to consider the plaintiffs' legal claims. See *University of Texas*, 451 U.S. at 395.

We therefore accept these factual findings made by the district court for the purposes of our present review:

"Senate Bill 95 prohibits the performance on a living fetus of an abortion procedure described in the Act as 'dismemberment abortion,' defined as a procedure done:
> with the purpose of causing the death of an unborn child, knowingly dismembering a living unborn child and extracting such unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors or similar instruments that, through the convergence of two rigid levers, slice, crush or grasp a portion of the unborn child's body in order to cut or rip it off.

S.B. 95 § 2(b)(1) [since codified at K.S.A. 2015 Supp. 65-6742(b)(1)].

"Violation of the ban is a criminal offense. . . .

"Although 'dismemberment abortion' is not a medical term, the parties agree and the Court finds that the Act prohibits Dilation & Evacuation ('D & E') procedures. The D & E procedure is used for 95% of the abortions done in the second trimester.

"The plaintiffs in this case are Hodes & Nauser, M.D.s, PA; Dr. Herbert C. Hodes; and Dr. Traci Lynn Nauser, on behalf of themselves and their patients. The Plaintiff physicians are board-certified obstetrician-gynecologists who practice in Overland Park, Kansas. They provide pre-viability second-trimester abortions using D & E procedures. The Plaintiffs do not induce fetal demise prior to their D & E procedures.

. . . .

"Defendants propose three alternative procedures to D & E: labor induction, induction of fetal demise using an injection, and induction of fetal demise using umbilical cord transection.

"Labor induction is used in approximately 2% of second-trimester abortion procedures. It requires an inpatient labor process in a hospital that will last between 5-6

7

hours up to 2-3 days, includes increased risks of infection when compared to D & E, and is medically contraindicated for some women.

"There is no established safety benefit to inducing demise prior to a D & E procedure.

"An injection of digoxin may be administered via either transabdominal or transvaginal injection. Injections to induce demise using digoxin prior to D & E are not practiced prior to 18 weeks gestation, and the impact of subsequent doses of digoxin, required in cases where a first dose is not effective, is virtually unstudied. Research studies have shown increased risks of nausea, vomiting, extramural delivery, and hospitalization.

"Umbilical cord transection prior to a D & E is not possible in every case. Requiring transection prior to a D & E increases procedure time, makes the procedure more complex, and increases risks of pain, infection, uterine perforation, and bleeding. The use of transection to induce fetal demise has only been discussed in a single retrospective study, the authors of which note that its main limitation is 'a potential lack of generalizability.'"

For the purpose of considering whether the district court properly entered its temporary injunction, we will now proceed to analyze the legal issues based on these factual findings. We recognize that the district court may well make different factual findings after each side presents its full evidence at trial. Our analysis at this stage of the litigation is therefore necessarily tentative, as it is based on the tentative factual findings now in place.

ANALYSIS

The parties agree that whether the Kansas Constitution recognizes any right to abortion is a purely legal question that we must answer to resolve this appeal. That question and two others guide our analysis.

8

The central issue we must decide is whether the Kansas Constitution provides any abortion rights. If not, then this new Kansas statute should be allowed to go into effect, as the plaintiffs have raised only Kansas constitutional rights as the basis for an injunction.

If the Kansas Constitution does provide some abortion rights, we must then answer two other questions. First, we would have to determine the standard we would apply to decide whether those rights have been violated. That also is a purely legal question. Next, we would apply that standard to the facts as found by the district court to determine whether this new statute would violate those rights. In doing so, we would also take into account the standards that apply when a plaintiff seeks injunctive relief (*i.e.*, a court order commanding or preventing some action, here preventing the new law from taking effect).

To obtain an injunction—even a temporary one—a plaintiff must make five showings to the court: (1) a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability that irreparable injury would take place without an injunction; (3) the lack of an adequate legal remedy (such as damages); (4) that the threat of injury outweighs whatever harm the injunction may cause the opposing party; and (5) that the injunction will not be against the public interest. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). In this case, however, at least for the purposes of this appeal, the State has focused exclusively on the first of those required showings—substantial likelihood of success on the merits. The State does so by arguing that the Kansas Constitution does not provide the right to an abortion and that even if it did, and even if that right brings into play the same standards now applied under the United States Constitution, the new statute would not violate those standards and accordingly should still be allowed to take effect. We therefore focus on whether there is an abortion right under the Kansas Constitution and, if so, whether the new statute would violate that right.

We review the grant or denial of a temporary injunction only for an abuse of discretion. *Downtown Bar and Grill*, 294 Kan. at 191. Even though that is often a quite deferential review, a court abuses its discretion if it bases its ruling on a legal error. *Kansas City Power & Light Co. v. Strong*, 302 Kan. 712, 729, 356 P.3d 1064 (2015). And our review of legal issues must be independent, without any required deference to the district court. *Downtown Bar and Grill*, 294 Kan. at 191-92. Thus, our primary role in this appeal is to answer the purely legal questions we have identified concerning whether the plaintiffs are likely to succeed on their claim that the statute violates the Kansas Constitution.

*Under Established Kansas Supreme Court Caselaw, the Kansas Constitution Recognizes a Right to Abortion.*

So we begin with whether the Kansas Constitution recognizes any right to abortion. On this question, we are guided primarily by two sources—the text of the sections of the Kansas Constitution cited by the plaintiffs and the caselaw of the Kansas Supreme Court interpreting those provisions.

The plaintiffs rely on sections 1 and 2 of the Kansas Constitution Bill of Rights. Section 1 provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Section 2 provides: "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. . . ."

Of course, we are not the first to consider these provisions—the Kansas Supreme Court has done so on many occasions; it is the final arbiter when interpreting the Kansas Constitution, including determining whether a statute violates that constitution. *Harris v. Shanahan*, 192 Kan. 183, 206-07, 387 P.2d 771 (1963). And as we noted in the introduction to this opinion, the Kansas Supreme Court has said in seven different cases

10

stretching from 1917 through 2005 that it gives these Kansas constitutional provisions "much the same effect" as the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Limon*, 280 Kan. at 283; *Parrish*, 257 Kan. 294, Syl. ¶ 5; *Kansas City*, 230 Kan. at 426; *Manzanares*, 214 Kan. at 602; *Henry*, 213 Kan. at 752-53; *Tri-State Hotel Co.*, 195 Kan. 748, Syl. ¶ 1; *Wilson*, 101 Kan. at 795-96. More recently, our Supreme Court noted that "at least for the past half-century, [it] has generally adopted the United States Supreme Court's interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution, notwithstanding any textual, historical, or jurisprudential differences." *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013).

The State argues that the words "due process" do not appear in sections 1 and 2 of the Kansas Constitution Bill of Rights, and that's obviously true. Even so, not only has our Supreme Court interpreted sections 1 and 2 to provide a due-process right, but section 1 contains language—the right to "liberty"—that fits squarely within both the federal abortion-rights cases and the broader substantive-due-process caselaw within which the federal constitutional right to abortion has taken form.

Both the Fifth Amendment (applicable to the federal government) and the Fourteenth Amendment (applicable to the states) to the United States Constitution provide that no person shall be deprived "of life, liberty, or property, without due process of law." These due-process provisions have long been interpreted not only to require that the government provide fair procedures when key rights are at stake but also to protect some key substantive rights from government interference—thus the term *substantive* due process.

In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), an abortion-rights case, the Court provided an overview

of these substantive-due-process rights. It explained that the right to abortion was derived from the word "liberty," just like the Court's other substantive-due-process caselaw:

> "Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment. It declares that no State shall 'deprive any person of life, liberty, or property, without due process of law.' *The controlling word in the cases before us is 'liberty.'* Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, since *Mugler v. Kansas*, 123 U.S. 623, 660-661 (1887), the Clause has been understood to contain a substantive component as well, one 'barring certain government actions regardless of the fairness of the procedures used to implement them.' *Daniels v. Williams*, 474 U.S. 327, 331 (1986). As Justice Brandeis (joined by Justice Holmes) observed, '[d]espite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States.' *Whitney v. California*, 274 U.S. 357, 373 (1927) (concurring opinion)." (Emphasis added.) *Casey*, 505 U.S. at 846-47.

In the first case the Court referred to, the 1887 case of *Mugler v. Kansas*, the Court considered whether Kansas statutes that made it a crime to manufacture intoxicating liquor violated a right to liberty that would allow a person to make liquor for his or her own use. The Court said there was a substantive limit to legislation that could be enacted for public health, morals, or safety: "It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation cannot rightfully go." 123 U.S. at 661. In *Mugler*, however, the State of Kansas had not gone beyond appropriate limits, as the Court noted the strong need to protect "the community against the evils which confessedly result from the excessive use of ardent spirits." 123 U.S. at 662.

12

In the early twentieth century, the United States Supreme Court found that a number of economic and social-welfare regulations unconstitutionally interfered with the protected interest in liberty. See 2 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure §§ 15.2-15.4 (5th ed. 2012); Barron & Dienes, Constitutional Law in a Nutshell, pp. 216-25 (8th ed. 2013). The most famous of these cases was *Lochner v. New York*, 198 U.S. 45, 53, 64, 25 S. Ct. 539, 49 L. Ed. 937 (1905), where the court invalidated a state law limiting bakery employees to no more than 10 hours of work per day and 60 hours per week, concluding that "[t]he right to purchase or to sell labor is part of the liberty protected" by the Fourteenth Amendment's Due Process Clause.

Later, beginning with *Nebbia v. New York*, 291 U.S. 502, 538-39, 54 S. Ct. 505, 78 L. Ed. 940 (1934), which upheld New York's minimum-price law for milk, the Court began a retreat from its close scrutiny of economic regulations. Today, unless equal-protection principles or fundamental rights are at stake, courts apply a much less rigorous test, approving state economic or social-welfare regulations so long as they are rationally related to a legitimate governmental interest. *E.g.*, *Williamson v. Lee Optical Co.*, 348 U.S. 483, 486-88, 75 S. Ct. 461, 99 L. Ed. 563 (1955) (upholding Oklahoma regulation of opticians where regulation might have been "a rational way to correct" a problem); *Manzanares v. Bell*, 214 Kan. 589, Syl. ¶¶ 7-8, 522 P.2d 1291 (1974) (stating that whether the Kansas no-fault insurance law "violates the due process clause is determined by whether its provisions bear a reasonable relation to a permissible legislative objective"; applying the Due Process Clauses in both United States and Kansas Constitutions); see *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 613-15, 576 P.2d 221 (1978); Rotunda & Nowak at § 15.4(e); Barron & Dienes, pp. 221-25.

Although substantive due process is no longer used to overturn any reasonable economic regulation, it has become the basis for constitutional rights related to privacy, marriage, family, and procreation—none of which are specifically mentioned in the United States Constitution. The Court has recognized the right to the use of

13

contraceptives in *Griswold v. Connecticut*, 381 U.S. 479, 481-85, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), the right to interracial marriage in *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967), the right to live with one's extended family, notwithstanding a city's zoning laws in *Moore v. East Cleveland*, 431 U.S. 494, 503-06, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality opinion), the right to refuse medical treatment in *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), the right of a fit parent to raise his or her children without state interference in *Troxel v. Granville*, 530 U.S. 57, 65-66, 68-69, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion), and, most recently, the right of a same-sex couple to marry in *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584, 2604-05, 192 L. Ed. 2d 609 (2015).

And, of course, the Court first recognized a right to abortion in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). The *Roe* Court discussed two bases for its conclusion that a right to privacy protected certain decisions a woman would make in terminating a pregnancy, but it relied primarily on the liberty interest found in the Fourteenth Amendment:

> "This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, *as we feel it is*, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." (Emphasis added.) 410 U.S. at 153.

Later cases have squarely tied the right to abortion to this liberty interest: The *Casey* opinion does so most clearly. In addition to the quotation we have already included in our opinion ("The controlling word in the cases before us is 'liberty.'" 505 U.S. at 846), the Court's opinion squarely relied on a liberty interest under the Due Process Clause:

14

"It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. . . .

. . . .

"Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." 505 U.S. at 847-51.

The State argues that none of this matters because "[n]o Kansas court has found that the Kansas Constitution includes a right of substantive due process . . . ." On that point, the State is simply wrong.

One year before the *Lochner* decision, in *Brick Co. v. Perry*, 69 Kan. 297, 76 Pac. 848 (1904), our Supreme Court struck down a Kansas statute making it unlawful to prevent employees from joining or belonging to a labor union. The court first noted that the defendant had claimed the law in question violated both the Fourteenth Amendment to the United States Constitution and section 1 of the Kansas Constitution Bill of Rights. 69 Kan. at 298-99. The court said there had been "an epidemic of this class of legislation" in the past two decades and that such laws had "been universally held to be a denial of rights guaranteed by the provisions of the national and state constitutions." 69 Kan. at 301-02. The court said that the statute was unconstitutional, 69 Kan. at 305, because the employer was "at liberty to contract for the services of persons in any manner that is satisfactory to both" and that "[n]o legislative restrictions can be imposed on the lawful exercise of these rights." 69 Kan. at 301.

15

Other Kansas Supreme Court decisions have also measured Kansas statutes against the substantive-due-process standards found in sections 1 and 2 of the Kansas Constitution Bill of Rights.

In *State v. Wilson*, 101 Kan. 789, 168 Pac. 679 (1917), the court upheld a statute limiting the use of trading stamps without payment of a license tax. The court specifically noted that it was applying sections 1 and 2 of the Kansas Constitution, which it said "are given much the same effect as the clauses of the fourteenth amendment relating to due process of law and equal protection." 101 Kan. at 795-96. The court said that more than 50 court decisions had found trading-stamp laws invalid but that the United States Supreme Court had very recently upheld them in two cases. Relying upon the United States Supreme Court's interpretation of the Fourteenth Amendment, our court concluded: "We acquiesce in the view of the federal supreme court that there is sufficient room for a reasonable difference of opinion as to whether the 'premium system' [used in trading stamps] is attended with evil consequences to the public, to place the affirmative decision of that question by the legislature beyond the reach of the courts . . . ." 101 Kan. at 800.

More recently, in *Manzanares*, 214 Kan. 589, the court considered the constitutionality of the Kansas no-fault insurance law. The court noted that "the Kansas Constitution's counterpart of the Fourteenth Amendment is Sections 1 and 2 of our Bill of Rights," 214 Kan. at 610, and the court concluded that the provisions of the law did "not violate the due process clause of either the Fourteenth Amendment to the Constitution of the United States or Sections 1 and 2 of the Bill of Rights of the Kansas Constitution." 214 Kan. 589, Syl. ¶ 8.

In sum, the Kansas Supreme Court has explicitly recognized a substantive-due-process right under the Kansas Constitution and has applied a substantive-due-process legal standard equivalent to the one applicable under the Fourteenth Amendment at the

16

time of these Kansas decisions. See also *Gilbert v. Mathews*, 186 Kan. 672, 677, 686, 352 P.2d 58 (1960) (striking down a statute regulating the sale of new goods at public auction by itinerant sellers as a violation of the federal and state constitutions, citing section 1 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment as the governing authorities). What the Kansas Supreme Court has not yet done is apply substantive-due-process principles in a case involving personal or fundamental rights, like the right to contraception, the right to marry, or the right to abortion.

As far as we are aware, the court has only been asked to do so once—in *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 128 P.3d 364 (2006), a case in which the court had to balance abortion rights and privacy interests against governmental investigatory powers. The *Alpha Med. Clinic* court noted the federal constitutional right to obtain an abortion without the government imposing an undue burden on that right. 280 Kan. at 920. The court then responded to a party's request that it also recognize the same right under the Kansas Constitution, declining to do so since it had already recognized the federal right:

> "We have not previously recognized—and need not recognize in this case despite petitioners' invitation to do so—that such [abortion] rights also exist under the Kansas Constitution. But we customarily interpret its provisions to echo federal standards. [Citations omitted.]" 280 Kan. at 920.

The court's final sentence—noting that it "customarily interpret[s]" Kansas constitutional provisions "to echo federal standards"—was unnecessary to the *Alpha Med. Clinic* decision and certainly is consistent with our understanding of its approach in substantive-due-process decisions from the early twentieth century to the present. But we do not recognize a right to abortion under the Kansas Constitution based on that hint from *Alpha Med. Clinic*. We do so because the Kansas Supreme Court has consistently interpreted sections 1 and 2 of the Kansas Constitution Bill of Rights as equivalent to the

17

Due Process and Equal Protection Clauses of the Fourteenth Amendment. Because the right to abortion is part of the liberty protected by the Due Process Clause to the Fourteenth Amendment, the Kansas Constitution provides the same right to abortion that is protected under federal law.

Before we conclude this section of the opinion, we should address one other argument the State has made against recognizing a right to abortion under sections 1 and 2 of the Kansas Constitution Bill of Rights—that the framers of the Kansas Constitution (who, we note, were all men) surely did not intend to create an abortion right in 1859, when the constitution was adopted. That may be true, but it has been recognized since before Kansas joined the Union that, as a matter of constitutional interpretation, the intent of the drafters with respect to broadly written rights is not the end of the matter. As Chief Justice John Marshall said, "[W]e must never forget, that it is *a constitution* we are expounding," "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. State of Maryland*, 17 U.S. (4 Wheat.) 316, 407, 415, 4 L. Ed. 579 (1819). So it has been in practice with the Due Process Clause, where new applications, unforeseen to the drafters, have arisen over time, like the right to contraception, the right to marry, and the right to abortion. So too with the prohibition on cruel and unusual punishment, where "evolving standards of decency" have been recognized under both the United States and Kansas Constitutions. See *Graham v. Florida*, 560 U.S. 48, 58, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *State v. DeCourcy*, 224 Kan. 278, 283, 580 P.2d 86 (1978).

We could go on with other examples, but neither the United States Supreme Court nor the Kansas Supreme Court has limited its interpretation of broadly worded federal and state constitutional provisions only to what was initially intended. Just last year, the United States Supreme Court once again quite clearly embraced this notion of constitutional interpretation in its *Obergefell* opinion, which determined that there was a right under the Due Process Clause to same-sex marriage:

18

"The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed." 135 S. Ct. at 2598.

The Kansas Supreme Court has made much the same point:

- "We are aware of the fact that constitutions and their interpretation should march abreast of the times. Words must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress." *Markham v. Cornell*, 136 Kan. 884, 891, 18 P.2d 158 (1933).

- "Until repealed or amended by the legislature, statutes stand immovable; constitutions march, aided by judicial interpretation necessarily employed to give full force and effect to the rights and privileges guaranteed by their general terms." *Postlethwaite v. Edson*, 102 Kan. 619, 643, 171 Pac. 769 (1918).

See also *Gannon v. State*, 298 Kan. 1107, 1155-56, 319 P.3d 1196 (2014) (noting that courts are regularly called upon to define and apply imprecise constitutional standards and that the understanding of these general standards—such as "cruel and unusual" or "equal protection"—may be refined over time).

From all of this, we discern a simple proposition: The rights of Kansas women in 2016 are not limited to those specifically intended by the men who drafted our state's constitution in 1859.

*We Apply the Undue-Burden Test Announced in* Casey *to Determine Whether the Kansas Constitution's Right to Abortion Has Been Violated.*

We next determine what standard we should apply to decide whether this new Kansas statute violates the abortion right provided under the Kansas Constitution. Since we have concluded that Kansas would apply the same due-process standards that the United States Supreme Court applies under the Fourteenth Amendment, we must first determine what those federal standards are.

Three United States Supreme Court cases are central here: *Casey*; *Stenberg v. Carhart*, 530 U.S. 914, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000); and *Gonzales v. Carhart*, 550 U.S. 124, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007). In *Casey*, the Court announced an "undue burden" standard to apply in determining whether an abortion-rights restriction is constitutional. 505 U.S. at 876-78 (plurality opinion). While that portion of the *Casey* opinion was adopted by only three justices (with two others adopting a more stringent test), a majority of the Court applied the *Casey* undue-burden test in *Stenberg*, 530 U.S. at 921, and *Gonzales*, 550 U.S. at 146. In addition, our Supreme Court recognized this as the applicable test in *Alpha Med. Clinic*. 280 Kan. at 920 (recognizing "the fundamental right of a pregnant woman to obtain a lawful abortion without government imposition of an undue burden on that right") (citing *Casey*). We therefore apply the undue-burden test here.

An undue-burden finding, as described in *Casey*, "is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877. The plaintiffs in our case have primarily argued that the new Kansas statute is unconstitutional based on its effect. A statute that furthers a valid state interest but "has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." 505 U.S. at 877.

20

*Under the District Court's Factual Findings, the Plaintiffs Have Shown a Substantial Likelihood That the New Kansas Statute Violates the Kansas Constitution.*

So far, we have determined that the Kansas Constitution does recognize an abortion right and that we should apply the undue-burden standard to determine whether that right has been violated. We must now determine whether the plaintiffs have made a sufficient showing that the statute would violate that standard to obtain a temporary injunction. To do so, the plaintiffs must demonstrate a substantial likelihood that they will ultimately prevail on this question. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012).

Given the district court's factual findings and the procedural status in which the case has reached us (a request for temporary injunction), the plaintiffs have made that showing. We reach this conclusion primarily based on the holdings of *Stenberg* and *Gonzales*.

In *Stenberg*, the Court found unconstitutional a Nebraska statute that the Court interpreted as banning both D & E and intact D & E abortions. 530 U.S. at 921-22, 938, 945-46. In *Gonzales*, the Court upheld a ban on only intact D & E abortions, finding that this limited ban did not constitute an undue burden and noting that D & E abortion, the most common type of second-trimester abortion and "'generally the safest method of abortion during the second trimester,'" remained legal. 550 U.S. at 164 (quoting *Carhart v. Ashcroft*, 331 F. Supp. 2d 805, 1031 [D. Neb. 2004]).

Kansas has banned the intact D & E abortion procedure since 1998. See K.S.A. 2014 Supp. 65-6721; L. 1998, ch. 142, sec. 18; L. 2011, ch. 91, sec. 30. By combining that ban with a new one on the D & E abortion procedure, Kansas has simply attempted to do in two statutes what the United States Supreme Court held Nebraska could not do in one—ban both D & E and intact D & E abortions.

The State contends, based on *Gonzales*, that the new Kansas statute is permissible because reasonable alternative procedures remain available. But the circumstances here are quite unlike *Gonzales*. There, the Court considered a ban on an *uncommon* procedure and noted that the most common and generally safest abortion method remained available. Here, the State has done the opposite, banning the most common, safest procedure and leaving only uncommon and often unstudied options available.

The State has offered three alternatives to the standard D & E procedure: labor-induced abortion, inducing fetal demise with digoxin injections, and inducing fetal demise by cutting the umbilical cord (also known as transection). The district court found that the State did not challenge the basic facts the plaintiffs submitted about these alternatives. In its reply brief on appeal, the State takes issue with this conclusion and states that it "cited numerous medical studies and journals to contradict Plaintiffs' assertions."

As we explained when we set out the district court's factual findings, we must accept those findings for the purposes of our decision here. This case is before the court on a temporary injunction, and the only evidence the district court received was written testimony the plaintiffs submitted from three physicians. Accordingly, it is possible that the district court will make different factual findings after both sides present their evidence at trial. In the meantime, we must rule based on the record as it exists. With that background, we will briefly review each of the alternative procedures the State argues are available in place of the standard D & E procedure.

First, the State does not dispute the plaintiffs' contention that labor-induction abortion is used in only 2% of second-trimester abortions in the United States. While the State notes that labor induction is generally safe and is the preferred method in some other countries, it hasn't disputed the plaintiffs' assertions that it is not medically recommended for some women, that it includes an increased risk of infection, and that it

22

requires a hospital stay of anywhere from 5 hours to 3 days. Of course, the woman also must go through labor.

Second, the State does not dispute that digoxin injections to induce fetal demise are only rarely used before 18 weeks gestation (while D & E abortions are often used beginning at 14 weeks). The State also does not dispute that the procedure sometimes requires multiple injections and that the effect of multiple injections hasn't been studied. The State acknowledges that digoxin injections create a risk of extramural delivery (unplanned fetal expulsion when the woman is not at a medical facility). In addition, the district court found that digoxin use caused increased risks of nausea, vomiting, and hospitalization.

Third, the district court found that umbilical-cord transection wasn't possible in all cases; that it increased the risk of pain, infection, uterine perforation, and bleeding; and that it increased the time required for the abortion. In response, the State cited one study that looked at umbilical-cord transection; while the study found that the procedure was safe, its authors noted that the results couldn't necessarily be generalized.

The State does not argue that these alternatives provide *any* safety benefit to the woman—the State simply argues that regardless of the additional risks, costs, and time that they impose, the alternatives are not an "undue burden." The board-certified physicians who provided testimony to the district court have never routinely induced fetal demise before performing a D & E abortion. Given the additional risk, inconvenience, discomfort, and potential pain associated with these alternatives, some of which are virtually untested, we conclude that banning the standard D & E, a safe method used in about 95% of second-trimester abortions, is an undue burden on the right to abortion.

Kansas courts presume that a properly enacted statute is constitutional, and the party claiming otherwise must prove its case. *Downtown Bar and Grill*, 294 Kan. at 192;

23

*State ex rel. Schneider v. Liggett*, 223 Kan. 610, 616, 576 P.2d 221 (1978). Based on the district court's factual findings, along with *Casey*, *Stenberg*, and *Gonzales*, the plaintiffs have done so here. The district court properly found that the plaintiffs had shown a substantial likelihood of prevailing on the merits in this lawsuit.

As we noted previously, the State has not challenged in its appellate brief the district court's conclusion that the plaintiffs had met the other requirements for a temporary injunction (irreparable harm, lack of adequate legal remedy, balance of harms in plaintiffs' favor, and injunction not adverse to public interest). Accordingly, the district court properly entered a temporary injunction so that the law would not take effect pending the full presentation of evidence at trial and a final decision by the district court.

CONCLUSION

We conclude with four final observations about the resolution of this case in our court.

First, we are not called upon in this case to announce, or to act upon, our own personal views regarding abortion. As the United States Supreme Court said in *Casey*:

"Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 850, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992).

We have done our best to carry out that obligation to define the liberty of all—squarely based on the precedents of the Kansas Supreme Court and the United States Supreme

24

Court, which we are required to apply—and not to mandate our own moral code or religious beliefs.

Second, this is the first case in which a Kansas appellate court has been required to decide whether the Kansas Constitution provides a right to abortion. That's because this is the first time a plaintiff has brought such a claim solely under the state constitution—even though the federal Constitution provides an abortion right. A plaintiff has the procedural right to choose the legal theories he or she will pursue; we cannot force the plaintiffs here to choose another legal avenue. See *The Fair v. Kohler Die Co.*, 228 U.S. 22, 25, 33 S. Ct. 410, 57 L. Ed. 716 (1913) (Holmes, J.) ("Of course, the party who brings a suit is master to decide what law he will rely upon . . . ."); *Xpedior Cred. Trust v. Credit Suisse First Boston*, 341 F. Supp. 2d 258, 268 (S.D.N.Y. 2004) ("The choice of legal theories is a strategic choice to be made by plaintiff, and neither the court nor the defendant is permitted to override that choice."); *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 463, 276 P.3d 773 (2012) ("A plaintiff may assert some available theories but not others. And the plaintiff may pick and choose at his or her discretion so long as the defendant has been fairly apprised of the circumstances.").

Third, our court is equally divided, seven voting to affirm the district court and seven voting to reverse. When an appellate court is equally divided, the trial court's ruling is affirmed. *Paulsen v. U.S.D. No. 368*, 239 Kan. 180, 182, 717 P.2d 1051 (1986); see *Neil v. Biggers*, 409 U.S. 188, 191-92, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

Fourth, although our court is equally divided, we believe we have still fulfilled our role in the Kansas justice system. An intermediate appellate court never has the final say; our ruling in this case will almost surely be reviewed at some point by the Kansas Supreme Court. In its review, the Kansas Supreme Court will have the benefit of the independent and careful review that all of our judges have provided to the issues

25

presented and the lessons to be learned from prior Kansas and federal cases. In the meantime, the parties must have a result, and we have provided that as well.

The district court's grant of a temporary injunction is affirmed by an equally divided court.

PIERRON, MCANANY, BUSER, STANDRIDGE, and ARNOLD-BURGER, JJ., join in the foregoing opinion.

\* \* \*

ATCHESON, J., concurring: In July 1859, delegates gathered to draft a constitution that would govern the Kansas Territory upon its recognition as a state. The 35 Republicans and 17 Democrats labored under the watchful eyes of a nation then riven by fierce debate over what we now know as undebatable—the illegitimacy of slavery and the role of government in denying an inherent right of self-determination to an entire race. That nation, too, had begun to brace for a cataclysmic resolution of the debate that optimistically might be confined to an extraordinary political upheaval but realistically could extract a far worse price paid in blood.

In that unparalleled time, the new Republican Party and its prominent exponents, among them a lawyer from Illinois named Abraham Lincoln, aligned with the abolitionist cause. They had taken up words from the Declaration of Independence as a rallying cry: "[A]ll men are created equal . . . endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." The delegates to the Wyandotte Convention deliberately drew from those words to fashion the first section of the Kansas Constitution's Bill of Rights: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Today, more than 150 years removed from that time and place, we have had thrust upon

26

us the task of applying § 1 of the Kansas Constitution Bill of Rights in a modern world to another aspect of self-determination more particularly associated with gender. It is not a task I would have sought out. Nor is it one for which we have much in the way of incisive guidance from our judicial predecessors.

To meet that task, we must first examine the circumstances prompting the delegates to turn to the language of the Declaration of Independence to define a constitutional right. And from those circumstances, we then have to discern how best to apply that constitutional right in a different time. As I outline, for Republicans advancing toward the inevitable final battle over slavery, the passage from the Declaration of Independence expressed not only a present intent to resist the spread of slavery whenever and wherever possible but also a fervent hope that in future times the constellation of rights there identified would be extended and deepened in a society respecting the essential freedom and liberty of each person and all peoples. That same aspirational spirit infused § 1 of the Kansas Constitution Bill of Rights.

True to that intent and hope, I must conclude the words of § 1—words that remain unchanged from the day they were adopted—continue to define a right of self-determination. And today in a society recognizing women as full and equal participants in both the benefits and burdens of that society, self-determination necessarily precludes the government from dictating fundamental decisions regarding reproduction and severely fences governmental intrusion otherwise aimed at influencing those decisions or impeding their implementation. Just as the State could not constitutionally compel a woman to terminate a pregnancy, it cannot prohibit her from doing so, subject only to carefully limited regulation necessary to serve essential governmental interests.

In turn, based on the limited record assembled in the early stages of this litigation, I agree the Shawnee County District Court correctly found Plaintiffs Herbert C. Hodes and Tracy Lynn Nauser, medical doctors who perform abortions as part of their practice,

have likely shown Senate Bill 95, codified as K.S.A. 2015 Supp. 65-6741 *et seq.*, violates § 1. See L. 2015, ch. 22. The record indicates Senate Bill 95 would complicate most second trimester abortions without advancing any genuine State interest. The district court, therefore, properly issued a temporary injunction halting its implementation.

The district court and my colleagues who would affirm the district court have concluded that § 1 and § 2 of the Kansas Constitution Bill of Rights effectively duplicate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, so they apply federal law governing abortion as Kansas constitutional law. I believe § 1 provides an entirely separate constitutional protection without direct federal counterpart. Because in my view § 1 alone supports the district court's ruling, albeit based on a different constitutional analysis, I consider § 2 only in passing.

I set out the basis for my conclusion in four parts. In the first section, I outline the historical context in which the drafters of the Kansas Constitution included § 1 in the Bill of Rights. Next, I discuss the protections in § 1 prohibiting undue government interference with those inalienable rights, including reproductive freedom, that compose self-determination. Third, I consider both the arguments the State has advanced against such protections and my colleagues' assessment that § 1 imports federal constitutional law to serve as state constitutional law. In the last part, I explain why Senate Bill 95 likely violates § 1, warranting injunctive relief during the pendency of this case.

I.

In less than 300 words spoken in a Pennsylvania hamlet on November 19, 1863, Abraham Lincoln cast an American creed that generally has come to be accepted as representing the noble best of this nation. Lincoln wove together intent and hope as he defined the proposition upon which this country was founded as the inherent right of all

28

men to equality and alluded to the unfinished work in advancing that cause. He then paid tribute to the ultimate sacrifice of the Union soldiers who perished there 4 months earlier in the battle of Gettysburg. In doing so, Lincoln traced the expression of this nation's essence to the Declaration of Independence. The indelible opening to the Gettysburg Address left no doubt as to the source of Lincoln's vision of that ideal—87 years measured from the creation of the Declaration of Independence. He looked to the same words the drafters of the Kansas Constitution placed in its Bill of Rights.

The intersection of Lincoln, the Declaration of Independence, and the Kansas Constitution is no accident of history. That intersection, amidst the bitter fight over slavery, imparts meaning to the Kansas Constitution and, in particular, § 1 of the Bill of Rights.

During the years the Kansas Territory struggled to secure entry into the Union as a free state, Lincoln often spoke publicly of the Declaration of Independence as the polestar in defining American idealism—most prominently, perhaps, in his own campaign for the United States Senate just months before his fellow Republicans led the way in drafting the Kansas Constitution at the Wyandotte Convention. The fate of Bleeding Kansas riveted a nation consumed by the intensifying storm of free colliding with slave and the underlying moral imperative of how the dispossessed and the disenfranchised ought to be treated in a fair society. On the eve of the constitutional convention, Kansas Republicans met as a party to adopt resolutions outlining their vision for a free and fair society. Their vision expressly saw in the Declaration of Independence recognition of fundamental rights extended to people "of all countries and all times."

As events in Kansas shaped national politics and debate, the reverse was also true. So historical context bears directly on what the drafters of the Wyandotte Constitution sought to achieve and how we should consider the result of their work a century and a half later.

29

The Kansas Territory undertook steps for admission to the Union in 1855, as free-state proponents repudiated the proslavery territorial legislature as illegitimate and gathered to draft the Topeka Constitution. Kansas statehood stalled in Congress, where Illinois Senator Stephen A. Douglas, a nationally prominent Democrat, helped orchestrate the opposition. In the meantime, proslavery forces came across the border from Missouri. Some of those "border ruffians" meddled in Kansas politics, leading to continual assertions of fraudulent territorial elections. Others chose more violent confrontations with their free-state counterparts, guerrilla skirmishing that prompted the "Bleeding Kansas" nickname.

In July 1856, the Republican Party held its first national convention in anticipation of the presidential election that fall. The party platform expressly invoked the Declaration of Independence and included a resolution that "the inalienable right to life, liberty, and the pursuit of happiness" should be "secure[d] . . . to all persons" and slavery should not be allowed in any territories. Much of the balance of the platform consisted of a remonstrance that "the dearest Constitutional rights of the people of Kansas have been fraudulently and violently taken from them" and a call for the immediate admission of the Kansas Territory as a free state. In the national election, Republican presidential candidate John Fremont carried 11 free states but lost to Democrat James Buchanan.

A year later, the proslavery Kansas territorial legislature authorized another constitutional convention. The delegates drafted the Lecompton Constitution explicitly permitting slavery as an exercise of an "inviolable" right to property "higher than any constitutional sanction." Continuing the byzantine political maneuverings that had come to be territorial politics, Kansans went to the polls during the convention and elected a free-state legislature. In December 1857, the Lecompton Constitution was then approved in a special election that most free-state proponents boycotted. In the meantime, the new legislature was called into special session and scheduled a second vote for January 1858, resulting in a sound rejection of the Lecompton Constitution.

Nonetheless, President Buchanan requested that Congress admit the Kansas Territory as a slave state under the Lecompton Constitution. That was too much for many northern Democrats who joined with Republican congressional members to derail Buchanan's proposal. The resulting compromise led to yet a third vote on the Lecompton Constitution in August 1858. It was voted down by more than 5 to 1.

On March 6, 1857, the United States Supreme Court ruled that Dred Scott, a slave, lacked standing to sue in federal court for the freedom of his family after they had been taken by their owner to several states and territories that outlawed slavery. *Scott v. Sandford*, 60 U.S. 393, 15 L. Ed. 691 (1856). The Court held that people forcibly brought to this country as slaves and their descendants were of an "inferior class of beings" and, therefore, could not be considered to have the legal capacity to sue in federal court. 60 U.S. at 404-05, 426-27. So, the Court said, Scott's suit should have been dismissed for want of jurisdiction. The Court went on to find slaves to be property and, thus, similarly incapable of bringing suit. 60 U.S. at 453. In arriving at those conclusions—rightfully considered perhaps the most judicially and morally reprehensible ever issued by the Court—Chief Justice Roger B. Taney took the opportunity to offer his assessment of the Declaration of Independence as a document describing rights belonging to the white race and to suggest any other purpose too farfetched to be fairly entertained. 60 U.S. at 410 ("The unhappy black race . . . were never thought of or spoken of except as property, and when the claims of the owner or the profit of the trader were supposed to need protection."). The decision ratcheted up the national debate over slavery and fueled the division between Republicans and Democrats and their free-state and proslavery backers.

In mid-June 1857, Senator Douglas gave a speech in the Illinois statehouse embracing Chief Justice Taney's view of the Declaration of Independence as he commented on the *Scott* decision and other issues of the day. He rhetorically suggested "any sane man" must believe the authors of the Declaration spoke only of the white race. Indeed, Senator Douglas offered that the rights described in the Declaration were

31

intended only for the British subjects residing in the colonies. Lincoln was invited to give a speech there and did so about 2 weeks later. The forum and the competing addresses bore significant political implications, since Lincoln had emerged as a likely challenger to Senator Douglas.[1]

[1]At that time, the United States Constitution empowered state legislatures to select senators. Lincoln and Douglas, thus, addressed the government body that would choose the next senator from Illinois. Not until ratification of the Seventeenth Amendment in 1913 did the United States Constitution mandate direct popular election of senators.

In what became known as the Dred Scott speech, Lincoln placed an entirely different meaning on the invocation of inalienable rights in the Declaration of Independence. Responding directly to Senator Douglas' cramped interpretation, he stated: "I had thought the Declaration contemplated the progressive improvement in the condition of all men everywhere." As an example, Lincoln offered the image of a slave *woman* who "in her natural right to eat the bread she earns with her own hands without asking leave of anyone else . . . is my equal, and the equal of all others."

Lincoln undertook an extended disquisition on the significance of including inalienable rights in the Declaration of Independence and the authors' conception of those rights as being fully realized not in their own time but in some more progressive era. In part, Lincoln said of Thomas Jefferson and the others who helped write the Declaration:

> "They defined with tolerable distinctness, in what respects they did consider all men created equal in 'certain inalienable rights, among which are life, liberty, and the pursuit of happiness.' This they said, and this meant. They did not mean to assert the obvious untruth, that all were then actually enjoying that equality, nor yet, that they were about to confer it immediately upon them. In fact they had no power to confer such a boon. They meant simply to declare the right, so that the enforcement of it might follow as fast as circumstances should permit. They meant to set up a standard maxim for free society, which should be familiar to all, and revered by all; constantly looked to, constantly

labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence, and augmenting the happiness and value of life to all people of all colors everywhere."

Barely a year later, the Republican Party nominated Lincoln to oppose Senator Douglas in his bid for reelection. The pair agreed to seven joint campaign appearances across Illinois that would form the historic Lincoln-Douglas debates, though in format they really were uninterrupted addresses in which one man spoke first and last with the other speaking in between. The campaign and the debates drew national attention in part because of Senator Douglas' political stature and in part because the issues drew heavily upon slavery, the status of the Kansas Territory, and the darkening specter of the Union metaphorically if not actually split in two. In that cauldron, Lincoln and Douglas again advanced their conflicting views of the Declaration of Independence.

At the fifth debate in Galesburg on October 7, 1858, Senator Douglas opened by discussing the Kansas-Nebraska Act and offering an extended explanation of his position on the Lecompton Constitution and the circumstances under which the Kansas Territory might be admitted as a state. After accusing Lincoln and the Republicans of waffling on the rights to be extended "the negro" in the Declaration of Independence, Senator Douglas affirmed that the founders intended to establish a government "made by white men for the benefit of white men and their posterity forever, and was intended to be administered by white men in all time to come." Early in his reply, Lincoln briefly dismissed Douglas' characterization of the Declaration of Independence as lacking any historical support.

But Lincoln returned to the topic in the remaining debates. Six days later in Quincy, Lincoln repeated that all people without regard to color were embraced within the Declaration of Independence and enjoyed "the right of life, liberty, and the pursuit of happiness." And he again alluded to a person's "right to eat the bread without the leave of

anybody else which his own hand earns." In the final debate in Alton on October 15, Senator Douglas spoke extensively about his unwillingness to support the Lecompton Constitution and the Democratic Party's desire that each state and territory decide for itself whether to permit or bar slavery. He also repeated his view that the Declaration of Independence was meant to apply only to men of European descent. During his response, Lincoln quoted at length from his Dred Scott speech and noted that those remarks had been printed and widely disseminated. He reiterated that the essential right set forth in the Declaration of Independence came with both a promise "that the enforcement of it might follow as fast as circumstances should permit" and an understanding that it would "constantly [be] spreading and deepening its influence . . . to all people, of all colors, everywhere."

Although Republican candidates for the Illinois Legislature captured more popular votes than their Democratic rivals in the election, the Democratic Party retained control of the legislature based on how the districts had been drawn and carry-over incumbents not up for reelection. As a result, the legislature returned Douglas to the Senate in January 1859. But the campaign—particularly the debates—vaulted Lincoln to national prominence as a powerful voice of the emergent Republican Party. He, of course, would go on to become the party's presidential nominee in 1860 and to beat Senator Douglas, the Democratic Party nominee, in a four-way race that included Southern Democratic Party candidate John C. Breckinridge and John Bell of the Constitutional Union Party.

When the Kansas Republican Party held its first political convention in mid-May 1859, the organization extended an invitation to Lincoln to address the proceedings. Although he declined, Lincoln sent a letter written for the occasion urging the party leadership to resist "the temptation to lower the Republican Standard in order to gather recruits," for doing so "would surrender the object of the Republican organization—the preventing the Spread and Nationalization of Slavery." In his stead, Horace Greeley, the

publisher of the New York Tribune and an early backer of the national Republican Party, spoke to convention attendees.

Greeley recalled the efforts of Republicans nationally in support of the Kansas Territory's admission to the Union as a free state in 1856 and referred to "the able and gallant Lincoln of Illinois" as a forceful opponent of allowing slavery to spread to free soil. In keeping with the occasion, Greeley pointed out that key principles of the Republican Party's national platform recognized "every innocent man has a right to himself . . . [and] to fair and just recompense for his own labor." And he scolded the Democratic Party for embracing "the natural, necessary, rightful subjugation of one race to another" contrary to the "fundamental position of Jefferson and the Fathers" expressed in the Declaration of Independence.

At the party convention, Kansas Republicans adopted resolutions that, among other things: (1) acknowledged the Declaration of Independence as containing "self-evident truths" that afford "popular rights for all countries and times;" (2) opposed the expansion of slavery to free states or territories and any importation of Africans as slaves; and (3) called upon the delegates to the Wyandotte Constitutional Convention to include in a bill of rights a provision that neither slavery nor involuntary servitude should ever be permitted in Kansas except as punishment for crimes. Those provisions paralleled the national party's platform and echoed Lincoln's invocation of the Declaration of Independence as a testament to a set of rights inhering in all peoples transcending both forms of government and societal precepts fixed in a particular era.

Six weeks later, the delegates to the Wyandotte Constitutional Convention gathered to do their work.

A fortnight into the convention, the delegates had one of their more protracted discussions over what would become § 1 of the Kansas Constitution Bill of Rights. As

originally proposed, the section was notably wordier and borrowed directly from the 1851 Ohio Constitution, which served as a template for much of the Bill of Rights and other parts of the Wyandotte Constitution. The debate included considerable back and forth over how the provision might affect criminal statutes and enforcement of the federal Fugitive Slave Act. A number of amendments were proposed and tabled. At least a couple of them appeared to be pointed jabs from one Republican delegate toward the Democrats, suggesting they wished to deny those rights to persons of African descent.

Toward the end of the debate, Samuel Kingman, a Republican, proposed the language that would become § 1. Kingman described the words as stating an "old truth" drawn from the Declaration of Independence—a document he said "formed part of our political creed, from which no man can extricate himself." Kingman, however, did not elaborate on the meaning he imputed to that particular truth and simply pronounced the language "broad enough for all to stand upon." Another delegate suggested the provision to be imprecise and again touched on the interplay between the Kansas Constitution and federal law. The delegates then approved Kingman's language on a 42 to 6 vote, a tally leaving 4 delegates unaccounted for.

In short order, the delegates adopted § 2 without debate. Likewise, without discussion, they adopted a prohibition of slavery as § 6—a provision that paralleled the state Republican Party's resolution approved that May.

The delegates completed their mission on July 29, 1859, although the Democrats refused to sign the finished document. The Wyandotte Constitution was, nonetheless, overwhelmingly approved by popular vote about 2 months later. With Lincoln's election as president in November 1860, southern states began seceding to form the Confederacy. Congress, less the members from those states, joined with departing President Buchanan to approve statehood for the Kansas Territory. On January 29, 1861, Kansas joined the Union as a free state with the Wyandotte Constitution as its charter. Lincoln took the oath

of office as President on March 4. The Civil War began on April 12 when Confederate troops fired on the federal garrison at Fort Sumter, South Carolina. The war ended 4 years later with military dead on both sides of more than 600,000 and an inestimable loss of civilian life and property. Less than a week after General Robert E. Lee's surrender to General Ulysses S. Grant, Lincoln belonged to the ages—the first American President to be assassinated.[2]

[2]An astute lawyer and canny politician, Lincoln also was an exceptionally able social engineer and statesman who turned his conceptualization of the intrinsic equality of all people and of governance by consent of the governed into secular American gospel. Those themes repeatedly appear in his public and private discourse, most recognizably in the Gettysburg Address. And Lincoln had long appropriated the Declaration of Independence to that purpose. So his expression of the document's vision may be more nearly his own than Jefferson's. Lincoln chose his words carefully, especially for prepared addresses, often with profoundly affecting results. In doing so, he also recast the medium of expression with a modernistic style that replaced grandiloquent rhetoric with direct, accessible phrasing. Lincoln, of course, mastered the medium as almost no one else ever has.

II.

A century and half removed from that epochal period, we have been asked to construe § 1 and § 2 of the Kansas Constitution Bill of Rights with little in the way of concrete guidance from either the convention debate itself or judicial decisions since. The chasm of time and circumstance between then and now defies any casual description. We must discern from that earlier time and circumstance why the drafters turned to language from the Declaration of Independence, and then we must gather the overarching purpose they imputed to words that had been appropriated in their era as guiding principle in the fight against slavery.

To that end, I put aside § 2 and return to it only briefly, since I do not see in § 2 rights that address the issue before us. But properly understood and applied, § 1 does. So I look there.

37

The text of § 1 is worth repeating: "All men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness." The sentence must be read and understood as expressing a single, complete idea. It shouldn't be broken into phrases or subparts as if it were a criminal statute outlining elements of an offense or a revenue measure listing taxable commodities. Section 1, rather, offers a profound declaration of a set of rights to be universally embraced across the artificial boundaries of nations and their governments and unburdened by some constricted sense of humanity drawn from a time past. The drafters, thus, constitutionalized a principle transcending institutional forms and temporal limitations to touch something more basic in defining the condition of living as a human being. Moreover, they acted with the hope and, indeed, the understanding that deep into the future, society would be better and fairer in ways they could not foresee, thus clarifying and even enhancing that definition. So the principle they captured in § 1 would be no less profound and no less necessary in that future time, which is to say our time.

The language obviously borrows from the Declaration of Independence, as Delegate Kingman explained. But § 1 takes full meaning from what the words had come to embody in 1859 as an integral statement of principle of the Republican Party, both nationally and in Kansas, and the abolitionist movement. What Jefferson and the others contributing to the Declaration of Independence might have meant provides historical backdrop. More removed still are the European philosophers, particularly John Locke, whose discourse on natural rights influenced Jefferson. Although slavery divided the colonial revolutionaries and the framers of the United States Constitution, it did so without the urgency of impending disaster. The Kansas Constitution was directly informed by the depth and immediacy of the crisis over slavery and the pronounced preferences of the Republican Party in addressing the crisis.[3]

[3]Delegate Kingman, a lawyer, served on the Kansas Supreme Court for about 14 years. A review using modern computerized search techniques indicates Kingman wrote no opinions discussing either § 1 or the Declaration of Independence.

The language of § 1 has no direct or even generally analogous counterpart in the United States Constitution. The provision, therefore, affords protections distinct from any in the United States Constitution and should be construed independently of federal constitutional law.

By invoking and constitutionalizing natural rights, § 1 brings into the sphere of government a set of principles that exist outside societal and representative organizations. Natural rights derive from an authority or source greater than those organizations and may be thought of as essential for a human being to live in a condition recognizing his or her humanity. Slavery, for example, is anathema to such natural rights. For one person to own another is to deprive the one owned of any semblance of autonomy, an indispensable component of any characterization of natural right reposing in the ability to think deliberately and act on that deliberation. Slaves are chattel of their masters, unable to come and go as they please, associate as they wish, or work in a manner of their choosing while enjoying the product of their labor. They are reduced to things—beasts of burden— toiling neither by their own election nor in their own service.

By natural right, then, one person may not be controlled by another. That is bound up in liberty as the term is used in § 1. Similarly, a person is entitled to his or her property without the interference of another. That is bound up in the pursuit of happiness, although the breadth of the phrase isn't especially well set. The rights, however, function collectively rather than distinctly to define what may be fairly considered as self-determination or the exercise of free will.

When people join together to form societal or governmental organizations for their mutual benefit, they leave their natural state and, thereby, cede any immediate resort to

those natural rights. They substitute some form of democratic decisionmaking designed to advance the good of the community. The bargain supposes that the organization will not decimate those natural rights. The organization, therefore, could not aid and abet slavery, either by facilitating its private institution or engaging directly in it as public policy. As suggested in the Declaration of Independence, should an organization transgress the natural rights of the members of a recognized group within the organization—"one people" in the words of the Declaration—that group could seek redress and, if rebuffed, "dissolve the political bands" of affiliation with the organization. The disaffiliation then restores the natural state as between the organization and the departing group.

Section 1, however, reconfigures the relationship between natural rights and a governmental entity by making those rights part of the government's charter to be considered and enforced in the same manner as other parts of the charter. In our tripartite forms of government at both the federal and state levels, the judicial branch has been entrusted with the duty to construe the charter, here the Kansas Constitution, and to determine if the executive branch or legislative branch may have overstepped the limits imposed in the charter. More or less, that is the task before us today with respect to Senate Bill 95.

The rights pronounced and protected in § 1 are those constituent in the natural right of self-determination. And in keeping with the intent of the Kansas Republicans of 1859 who drafted and approved § 1, the right of self-determination should be assessed as one for all times. Just as self-determination may be realized in freedom from bondage and in the concomitant ability to make choices, both profound and prosaic, it necessarily extends to procreation. Decisions about procreation infuse self-determination and the manner in which a sense of self may be projected forward. Some may choose offspring as their favored medium for projecting themselves into the future. Others may choose good works apart from childbearing and childrearing. But even less contemplative decisions

regarding procreation are equally an exercise of self-determination and must be so treated. Self-determination is not reserved for the especially insightful or the deeply philosophical.

Because reproductive freedom is an essential quality of self-determination and, thus, a natural right, § 1 shields that freedom against excessive governmental encroachment. Consistent with § 1, the State cannot compel a woman to bear children. Nor can it compel her to terminate a pregnancy or to be sterilized upon giving birth to a healthy child. But, likewise, the State may not force the opposite choices upon a woman, for that is equally incompatible with the constitutional shield for self-determination. A woman has a right to reproductive freedom that entails deciding whether to continue or terminate a pregnancy. In short, § 1 prevents the State from banning abortion and substantially limits government regulation impeding the exercise of self-determination as expressed in an individual's decisions regarding procreation.

That result is entirely in keeping with the progressive, aspirational quality the Republican Party had advanced for the language of the Declaration of Independence preceding the Civil War. In the hands of the Republican delegates to the Wyandotte Convention, the same quality infused the words of § 1 with the same spirit and hope for a fair society eventually exceeding their expectation or comprehension.

In that time, women were denied much of any role in government and were kept from any semblance of full and equal participation in society generally. They were treated as distinctly less able than men—best suited for domesticity rather than decisionmaking. Most visibly, of course, women could not then vote or hold public office. We now recognize women to be just as capable as men in managing their own affairs and those of government and industry. Although the general societal and legal acceptance of gender equality hasn't yet reached every quarter, § 1 doesn't bend to the

obdurate views of those who would cling to the days when white men were the acknowledged masters of the realm.

Consistent with the drafters' overarching vision for § 1, women cannot now be permitted only a half-measure of self-determination. Accordingly, women have a right protected in § 1 to exercise reproductive freedom as an essential component of their self-determination. To suggest otherwise ignores the promise of § 1 as a forward-looking right and denigrates women as human beings lacking the capacity to make decisions for themselves. The suggestion, in turn, simply inflates a pernicious stereotype that women are flighty creatures in constant need of guidance and protection to be supplied either by menfolk or, in this case, a meddlesome government. That sort of paternalistic claptrap animates the majority opinion in *Gonzales v. Carhart*, 550 U.S. 124, 159-60, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007), the United States Supreme Court's most recent pronouncement on federal abortion rights. See also 550 U.S. at 183-86 (Ginsburg, J., dissenting) (dismissing the notion as an "antiabortion shibboleth" that "concededly" lacks supporting evidence). But the notion has no place in assessing the scope of § 1 in a modern world—a world the drafters of the Kansas Constitution anticipated, even though they understood they could not envision its particular contours. In short, § 1 cannot now be constrained by a definition of a woman's right to self-determination dependent upon mid-19th Century social and political conventions.

Constitutional rights, however, are not boundless, and self-determination, as protected in § 1, is no exception. But self-determination is an essential right deserving of the utmost respect. Accordingly, government action—here in the form of a legislative enactment—may not summarily or heedlessly impede that right. Any impairment must be carefully circumscribed to further an essential governmental interest. For example, statutes generally regulating medical procedures, physicians, and other aspects of the healing arts would not run afoul of § 1, especially if they were intended to materially enhance patient safety. Conversely, given the apparently low incidence of complications

42

associated with widely used surgical and nonsurgical abortion procedures, the State presumably could not single out those procedures or the medical practitioners using them for heightened regulation without some exceptional justification. In Section IV, I discuss how this standard applies to Senate Bill 95 and why Senate Bill 95 appears to contravene § 1.

In at least some iterations, natural rights did not extend to those incapable of exercising them, notably children and the mentally infirm. Those individuals, however, were considered wards of immediate relatives, such as parents, who would act as their guardians. As I have said, § 1 does not consist of unalloyed natural rights, since the very inclusion of them in a constitution transforms them from rules operating in an environment without government to a brake on government. Government entities have long exercised *in loco parentis* supervision over minors and have facilitated legal guardianships for the incompetent. Nothing in § 1 upsets those governmental functions, so that a parent chronically neglecting or abusing a child could be sanctioned civilly or criminally.

In that context, a viable fetus has a peculiar legal status. A viable fetus is capable of living apart from its mother but isn't doing so. Yet, the fetus is not counted as a child in many respects. Age is measured from birth, not viability. The same is true for income tax deductions. Nonetheless, the capacity of a viable fetus is such that the State may exercise some degree of stewardship for its welfare. Accordingly, the State may limit a woman's exercise of reproductive freedom in terminating a pregnancy after the fetus has reached viability.

Before reaching viability, however, a fetus is, by definition, incapable of independent existence. And the fetus is similarly incapable of free-will or self-determination—attributes necessary to exercising natural rights. In that situation, a woman's right of self-determination, as established in §1, takes precedence over any

inchoate interest of a fetus that is not yet viable. Similarly, governmental interference with a woman's decision regarding a pregnancy at that point would effectively reduce an inalienable right to a limited license.

In 2013, the Kansas Legislature enacted K.S.A. 65-6732 reciting as findings that life begins at conception and that upon fertilization, a human ovum immediately has a protectable interest "in life, health and well-being." Based on those findings, the statute requires state law to "be interpreted and construed" to give the zygote as it gestates the legal rights accorded "other persons, citizens and residents of this state." K.S.A. 65-6732(b). The statute cannot, however, alter the constitutional rights secured in § 1. That's because the legislature cannot mandate how the courts construe constitutional protections. And K.S.A. 65-6732(b) more or less acknowledges as much by noting its effect is "subject only to" the United States Constitution and the Kansas Constitution. To suppose otherwise negates the fundamental authority of the judiciary. *Gannon v. State*, 298 Kan. 1107, 1160-61, 1168, 319 P.3d 1196 (2014); *Board of County Com'rs of Leavenworth County v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 916, 933 P.2d 698 (1997) ("When a question of interpretation of the Kansas Constitution arises, it is the function and duty of this court to define constitutional provisions.").

As the State has pointed out in this case, the Kansas Constitution may be changed if the legislature chooses to put a proposed amendment to a vote of the people. See Art. 14, § 1, Kansas Constitution. To the extent the legislature believes the protections for self-determination in § 1 may be in need of change, it has the authority to ask the people to consider taking such a step. The legislature cannot statutorily circumvent the people's prerogative by directing how the judiciary must interpret the constitution. But I read K.S.A. 2014 Supp. 65-6732(b) to include legislative recognition that the courts (properly) should not apply the statute in construing the Kansas Constitution. Given that recognition, I need not explore potential defects in the statute itself.

Self-determination, of course, is not confined to reproductive freedom. Nor is § 1. This case, however, requires no greater elaboration on the breadth of § 1. The component natural, inalienable rights protected in § 1 are necessarily narrow, since they originate outside the constructs of government and organized society and their exercise must be essential for a person to act as an independent human being. At the same time, a natural right, if exercised, cannot diminish another person's rights. So taking someone's property isn't a natural right. By and large, criminal statutes would not, then, run afoul of § 1 certainly insofar as they impose punishments of incarceration for *malum in se* offenses. *Malum prohibitum* offenses generally carry comparatively minor punishments that wouldn't even arguably implicate § 1. The forensic foil of a life sentence for a parking offense, see *Rummel v. Estelle*, 445 U.S. 263, 274 n.11, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980), presumably would, but it also would undoubtedly violate the ban on cruel or unusual punishment in § 9 of the Kansas Constitution Bill of Rights.

How arguably more targeted provisions of the Kansas Constitution, such as § 9, interact with § 1 isn't wholly obvious. The lines of division in the Bill of Rights aren't precise. For example, the prohibition on slavery in § 6 also bars "involuntary servitude, except for the punishment of crime[.]" As a result, the exception in § 6 presumably limits the proscription in § 9. Similarly, slavery violates both § 1 and § 6, so those provisions act in tandem. Section 1, in turn, must reach beyond slavery, as the common understanding of natural rights would suggest and as the aspirational intent of the drafters would require. The provision otherwise would have been redundant and unnecessary. To address the issues at hand, I need not plumb the legal relationship between § 1 and the other protections in the Kansas Constitution Bill of Rights.

I turn briefly to § 2, since Drs. Hodes and Nauser also premise their action on that part of the Kansas Constitution Bill of Rights. Section 2 provides:

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

In the first sentence, the drafters expressed the broad idea that governments derive their legitimacy from the consent of the governed. If a government acts contrary to that consent or dismisses such consent as superfluous, it can no longer be characterized as "free" and, presumably, has become tyrannical. I don't especially see in that statement a specific protection "the people" may enforce through the judicial process so much as an implicit recognition of the pronouncement in the Declaration of Independence that an identifiable constituency has an inherent right to sever connections with a government turned repressive.

But that acknowledgment serves as a prelude to the balance of the sentence that states free governments are to afford "equal protection and benefit" to the people. The second clause easily can be read to secure a right comparable to the Equal Protection Clause of the Fourteenth Amendment, as the Kansas Supreme Court has recognized. See *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005). We do not, however, have an equal protection claim in front of us. The second sentence of § 2 precludes the legislature from authorizing irrevocable "privileges or immunities." Whatever the limitation imposed by that part of § 2, it has no apparent application here, and none of the parties has argued otherwise.

### III.

The State contends § 1 contains no enforceable rights and is merely a precatory platitude. But that plainly is incorrect. Had the drafters meant the language of § 1 to be constitutional filigree, they would have put it in the preamble. The Lecompton

46

Constitution, for example, included a statement similar to § 1 in the preamble with no comparable provision within its text. The difference, especially with the importance those words bore for the Republicans, is compelling.

During the Wyandotte Convention debate, the delegates argued whether § 1 could be construed to relieve Kansans of any obligation to enforce the federal Fugitive Slave Act. The discussion would have been wholly unnecessary had the delegates intended § 1 to establish no enforceable constitutional rights. None of the delegates offered that idea as a denouement to the disagreement.

The Kansas Supreme Court has consistently indicated § 1 and § 2 have much the same effect as the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Limon*, 280 Kan. at 283; *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974). Although those statements do little to fix the precise contours of § 1 and § 2, they cannot be reconciled with an argument that either provision is merely the constitutional counterpart of a zero—a placeholder adding nothing of real value.

The court's decision in *Schaake v. Dolley*, 85 Kan. 598, 118 P. 80 (1911), has been tossed around as supporting the State's argument. But it doesn't. Without citing any particular authority, the court recognized § 1 to protect a liberty interest resting in a person's right to engage in "a gainful occupation of his own choosing." 85 Kan. 598. To me, that sounds more like economic due process than inalienable right and seems to rest on now discarded *Lochnerian* notions that laborers enjoy the "freedom" to agree to work inhumane hours for depressed wages because oligopolistic employers have the power to impose those conditions. See *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); *Lincoln Federal Labor Union, No. 19129 v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 534-37, 69 S. Ct. 251, 93 L. Ed. 212 (1949) (tracing rise and ultimate rejection of substantive due process right to contract); *Lochner v. New York*, 198 U.S. 45, 53, 25 S. Ct. 539, 49 L. Ed. 937 (1905) (right to contract regarding commerce

47

recognized as liberty interest protected in Fourteenth Amendment from government regulation of terms and conditions of employment). Pertinent here, however, the court found § 1 to be a source of enforceable rights, thus contradicting to the State's argument to us.

The *Schaake* court went on to say that the right to pursue employment had to yield to reasonable government regulation aimed at promoting the common good, so the plaintiffs had no constitutional right to insist the state agency regulating banking issue them a charter for what would be the fifth bank in Abilene—something the agency determined would exceed marketplace demand and imperil the stability of the banks. In that context, pertaining to economic regulation, the court observed that § 1 "cannot be entirely disregarded" but serves more as a guide to the legislature to act appropriately in the public interest than as a grant of judicial authority to supplant reasonable legislative action. 85 Kan. at 601. The court's admonition, however, does not obviously extend beyond the economic interests of the kind at issue in the case. Its lengthy discussion fairly well confirms as much.

The *Schaake* decision also suggests a court could not turn to natural law, as such, to resolve a legal dispute. 85 Kan. at 602. As I have indicated, that is true. But it really has nothing to do with applying § 1. Natural law exists outside the constructs of government. Courts, as creatures of the government, are empowered to construe and apply the rules of the government as expressed in an organic document, legislative enactments, and judicial precedent. They have no license to reach beyond those rules to decide the matters before them. Section 1, however, constitutionalizes a segment of natural law defining self-determination, thereby bringing that set of rights within the rules of government and the body of law the Kansas courts may draw upon in settling legal disputes.

48

The State also relies heavily on Kansas Territorial statutes in effect at the time the Wyandotte Constitution was drafted that prohibited abortions except "to preserve the life" of the woman and criminalizing an abortion of a "quick child" as manslaughter and otherwise as a misdemeanor. Kan. Terr. Stat. 1855, ch. 48, § 10; Kan. Terr. Stat. 1855, ch. 48 § 39. Similar statutes remained in effect for over 100 years. In 1969, the Kansas Legislature considerably broadened the health exception, L. 1969, ch. 180, sec. 21-3407, although abortion otherwise remained illegal in Kansas until *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). The State argues that history undercuts any contention the drafters intended § 1 or any other part of the Kansas Constitution to permit abortions.

We may fairly conclude the delegates to the Wyandotte Convention did not consider reproductive freedom or abortion in drafting the Kansas Constitution. But that doesn't mean the drafters intended § 1 to be a static statement of self-determination. The circumstances strongly indicate otherwise and show the drafters meant to provide a constitutional protection that would grow to take account of maturing societal values they recognized they could not necessarily foresee. As I have already explained, § 1 strove to capture a right with a "spreading and deepening" influence reflecting "the progressive improvement in the condition of all men everywhere," as Lincoln expressed it, and a right "for all times," as Kansas Republicans put it just weeks before the Wyandotte Convention. So that history does not trap women with a stunted measure of self-determination today.

I turn next to the reading my colleagues give to § 1 in affirming the district court's temporary injunction. They say the Kansas Supreme Court has found in § 1 a constitutional equivalent to the Due Process Clause of the Fourteenth Amendment. So § 1 necessarily includes the unenumerated constitutional rights comprising the substantive due process liberty interests protected in the Fourteenth Amendment. Those interests include, among other things, interlocking rights to be free of undue government intrusion

in decisions about contraception and childrearing and a prohibition on involuntary sterilization as a penal sanction. Based on those precedents, the United States Supreme Court recognized a substantive due process right to abortion. See *Roe*, 410 U.S. 113. If § 1 replicates in all respects the Due Process Clause, then it obviously includes the same right to abortion. In effect, as Judge Leben explains, the federal constitutional law of abortion becomes the Kansas constitutional law of abortion.

Assuming the constitutional equivalence of the Due Process Clause of the Fourteenth Amendment and § 1 of the Kansas Constitution Bill of Rights, I would agree with Judge Leben's conclusion that Senate Bill 95 likely contravenes the Kansas Constitution based on the limited record compiled in the district court. I would, therefore, also agree that the district court properly issued a temporary injunction.

Although I ultimately arrive at the same legal conclusion, I question the assumption of equivalence. I have a difficult time seeing in § 1 a due process provision akin to the Fourteenth Amendment, and I don't believe the drafters intended to adopt such a provision. Rather, as I have explained, § 1 rests on language intentionally taken from the Declaration of Independence that is without a counterpart in the United States Constitution. As such, § 1 provides a constitutional protection that has no direct analog in the federal Constitution. So § 1 should not be construed or applied using federal constitutional law as guide, let alone an exact template. If, however, § 1 does include Fourteenth Amendment due process rights, those rights must be in addition to and not to the exclusion of the "equal and inalienable natural rights" actually described there.

The delegates to the Wyandotte Convention could not have intended to incorporate the Fourteenth Amendment into the Kansas Constitution, since the amendment would not be drafted for another 6 years. But the Fifth Amendment to the United States Constitution bundles together a number of diverse protections, including a Due Process Clause. It, in part, states: "[N]or shall any person . . . be deprived of life,

liberty, or property, without due process of law." Although the Fifth Amendment applies to the federal government, its due process provision parallels what would later appear in the Fourteenth Amendment as a check on state action. Clear due process language was no mystery in 1859. Even more immediate for the Wyandotte Convention delegates, the Lecompton Constitution did include a due process clause. Section 9 of the Lecompton Constitution Bill of Rights provided: "[N]o freeman shall be . . . deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land."

The Wyandotte Constitution lacked an explicit due process provision like the ones in the Fifth Amendment and the Lecompton Constitution. But it did incorporate double jeopardy and self-incrimination protections for criminal defendants, mirroring those portions of the Fifth Amendment. See Kansas Constitution Bill of Rights § 10. And § 18 of the Bill of Rights guaranteed Kansans a "remedy by due course of law" for "injuries suffered in person, reputation or property," a provision still recognized to require fair procedures for resolving legal disputes. *Harrison v. Long*, 241 Kan. 174, 178-79, 734 P.2d 1155 (1987). But § 18 has never been construed to be a repository of unenumerated constitutional rights.[4] The omission from the Kansas Constitution of due process language like that in the Fifth Amendment, especially coupled with the inclusion of double jeopardy and self-incrimination protections, must be seen as the drafters' exercise of studied consideration rather than as the result of inadvertence. Moreover, nothing in the Wyandotte Convention debate on § 1 suggests the delegates intended the provision to protect procedural or substantive due process rights rather than to constitutionalize the inalienable rights enunciated in the Declaration of Independence and championed by the Republican Party.

[4]Section 18 requires an adequate substitute remedy if the legislature limits or abrogates a common-law cause of action. See *Bair v. Peck*, 248 Kan. 824, 838-39, 811 P.2d 1176 (1991); *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974). But the substitute-remedy principle is quite different from substantive due process and the recognition of rights not explicitly stated in constitutional text.

As Judge Leben explains and I have noted, the Kansas Supreme Court has frequently indicated § 1 and § 2 function at least similarly to the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The court has consistently considered the two sections as if they were conjoined constitutional twins. But they shouldn't be treated as more interdependent than any other provisions in the Bill of Rights. And, as I have also noted, § 2 alone can be fairly construed as comparable to the Equal Protection Clause.

Nobody, however, has unearthed a case in which the Kansas Supreme Court has actually relied on § 1 to find and enforce an unenumerated constitutional right to decide a legal controversy. Many of the cases, particularly the early ones, are mishmashes that mention both federal and state constitutional rights and never really explain the actual bases for their rulings. The decision in *Brick Co. v. Perry*, 69 Kan. 297, 76 Pac. 848 (1904), is illustrative. The opinion referred to § 1, the Fourteenth Amendment, the right to contract, and a natural right prohibiting one person from being compelled to provide personal services to another. 69 Kan. at 299-301. Without mapping out a coherent analytical path through that terrain, the court simply held the statute, prohibiting an employer from discharging an employee because of union affiliation, to be unconstitutional.

Some decisions describing § 1 and § 2 as akin to the due process and equal protection rights in the Fourteenth Amendment decide the disputed issues solely on equal protection grounds and, thus, do little more than mention due process. See, *e.g.*, *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 759-61, 408 P.2d 877 (1965). Other decisions simply find no basis for relief in § 1 given the facts and, therefore, do not define the nature or scope of its protections. In *State v. Wilson*, 101 Kan. 789, 168 Pac. 679 (1917), the court found statutory limits on the distribution and redemption of trading stamps implicated no fundamental rights protected in § 1 however the provision might be construed. More recently in *Manzanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974), the

court upheld compulsory no-fault auto insurance, rejecting a claim the statutory scheme impaired § 1 rights. The *Manzanares* decision can be read either to tacitly say § 1 and § 2 provide due process protections or to simply assume as much in rejecting plaintiffs' arguments. 214 Kan. at 608-09. The negative conclusions in *Wilson* and *Manzanares* serve as examples of what § 1 does not protect and offer little to establish what § 1 does protect.

Those decisions do not, however, specifically hold § 1 to be a source of rights otherwise unstated in the text of the Kansas Constitution. So the idea that § 1 is a repository of those rights, thus replicating the substantive due process component of the Fourteenth Amendment, is a jurisprudential abstraction—a hypothetical possibility that has never been turned into the reality of a ruling. I am disinclined to treat § 1 that way absent a definitive determination from the Kansas Supreme Court, especially when the language and history of the provision offer only scanty support. To reemphasize my earlier point, even if § 1 includes due process protections, they do not squeeze out the inalienable rights expressly identified in the text.

Accordingly, the protection for reproductive freedom in § 1 is materially different from the substantive due process right to privacy secured in the Fourteenth Amendment and the related federal right to abortion recognized in *Roe*, 410 U.S. at 152-54. Section 1 derives from natural law, a source external to the Kansas Constitution, and is intended to be forward-looking, taking account of societal conditions as they are when the right is invoked. In turn, § 1 effectuates self-determination consistent with an evolving and ever more enlightened understanding of humanity across both race and gender. Conversely, substantive due process encompasses unenumerated or implicit rights that originate within the United States Constitution and are then enforced as "liberty" interests protected in the Fourteenth Amendment. Precisely because those rights have no explicit verbal anchor or identification in any specific constitutional text, they are typically defined through a backward-looking analysis focusing on what has already been accepted

over time as a "deeply rooted" part of national history and experience. *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).

The "liberty" in § 1, however, is simply an example of a natural right. It does not absorb implicit constitutional rights and make them natural rights protected in § 1. In other words, the liberty of § 1 is simply one expression of self-determination, just as reproductive freedom is another. By contrast, the liberty of the Fourteenth Amendment's Due Process Clause is a repository for otherwise unexpressed federal constitutional rights. Those implicit rights are not natural rights. So the liberty of § 1 is neither the legal equivalent of nor interchangeable with the liberty of the Due Process Clause. The protections of § 1 would exist as they are now even if there were no federal substantive due process.  In turn, federal law governing substantive due process, including privacy and abortion, has no particular application in construing § 1 either directly or by analogy.

Buttressing the distinction, the Declaration of Independence is not itself a source of enforceable law in the same way the United States Constitution or federal statutes are. The United States Supreme Court does not invoke the language of the Declaration of Independence as controlling authority to resolve legal disputes, including those involving abortion rights. And the framers of the United States Constitution did not transplant language from the Declaration of Independence to create constitutional rights. The ideas set forth in the Declaration of Independence do inform an American tradition or creed that may guide the courts in exploring those values and precepts to the extent they might bear on federal law. Section 1, however, stands on an entirely different footing. As a part of the Kansas Constitution Bill of Rights, § 1 enunciates a positive, enforceable constitutional mandate that shields identified rights drawn from the Declaration of Independence rather than implicit rights originating elsewhere in the Kansas Constitution.[5]

[5]In the Declaration of Independence, the inalienable rights extended to all peoples are said to have originated with "their Creator." And the Declaration similarly refers to "Nature's God" in explaining the authority justifying the dissolution of a political union. Section 1, however, omits any reference to the origin of the natural law constitutionalized there. I read little into those editorial differences, as such. The described rights exist outside of and independent of governmental entities, making them natural and inalienable. Apart from that, their origins seem more a matter of philosophy than jurisprudence. Jefferson, the primary author of the Declaration of Independence, is frequently described as something of a deist, acknowledging a supreme being but embracing no particular religion. So the references in the Declaration of Independence do not plainly point to Christian or Biblical teachings as interpretive tools. The absence of any such references in § 1 only underscores the inapplicability of religious dogma as constitutional subtext.

Along the same lines, § 1 cannot be readily construed to contain a right matching Fourteenth Amendment equal protection. Section 1 refers to "equal and inalienable natural rights," meaning simply that one person is entitled to no greater measure of those rights than any other person. As a constitutional protection, § 1 broadly prevents the government from affording some people or identifiable groups greater self-determination than others. That is not nearly as expansive as the Equal Protection Clause, which requires a government to treat similarly situated individuals equivalently in all respects absent sound policy reasons for doing otherwise. See *Reed v. Reed*, 404 U.S. 71, 75-76, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971).

As a matter of textual interpretation, the word "equal" in § 1 describes the phrase "natural rights" to define what the people possess. Everybody, therefore, has the same natural rights. That parallels the language from the Declaration of Independence recognizing that "all men are created equal" and expresses the same idea. Section 1 does not establish "equal rights," on the one hand, and "inalienable natural rights," on the other, as two distinct sets of rights—a misreading that would at least foster an argument for § 1 functioning in part like the Equal Protection Clause.

IV.

The remaining question before us asks whether Senate Bill 95 comports with § 1 of the Kansas Constitution Bill of Rights. At this stage, Drs. Hodes and Nauser need only show a substantial likelihood that the measure impermissibly impairs the right of self-determination protected there. If so, the district court properly entered the temporary injunction. As Judge Leben has explained, the State does not dispute that Drs. Hodes and Nauser have satisfied the other criteria for a temporary injunction.

Senate Bill 95 effectively prohibits a physician from performing a dilation and evacuation abortion without first stopping the fetus' heart. The D & E procedure is the most common method of abortion in second trimester pregnancies. Drs. Hodes and Nauser perform D & E abortions beginning in the 15th week of pregnancy. They do not stop the fetal heart before terminating the pregnancy. Some physicians apparently do induce fetal heart stoppage as part of their protocols for performing D & E abortions in pregnancies that have reached 18 weeks, according to the evidentiary record in the district court.[6]

[6]In abortion challenges decided under federal law, physicians have standing to assert the constitutional rights of their patients. See *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013). Although Drs. Hodes and Nauser rely on state constitutional rights in this case, the parties do not suggest a problem with standing. Especially if substantive federal abortion law *is* Kansas abortion law, the standing requirements ought to follow, as well. I have no reason to suppose physicians lack standing to assert their patients' § 1 protections for reproductive freedom, as an independent state constitutional right. Senate Bill 95 would subject Drs. Hodes and Nauser to criminal penalties for continuing to perform D & E abortions as they have. The threat of those sanctions would deter Drs. Hodes and Nauser, directly impairing their patients' constitutional rights. Those closely intertwined interests, the nature of the right impaired, and a looming legal injury in-fact to the physicians support standing. See *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 406, 197 P.3d 370 (2008).

The evidentiary record is quite limited. Drs. Hodes and Nauser submitted several written statements, including their own. The statements refer to medical literature from various sources, including journals and a practice guide from the American College of Obstetricians and Gynecologists. The State offered no countering statements but cited some of the same literature and a few other medical publications in its responsive papers to the district court. The district court held a hearing on the temporary injunction at which the lawyers argued their clients' respective legal positions. Neither side called any witnesses. I presume a merits trial would prompt a more extensive airing of evidence on medical practices for second trimester abortions.

A fetus is not viable until sometime after 20 weeks' gestation. I take what may be a lay view of viability to mean the fetus has reached a point of gestational maturity to survive with immediate extraction and exceptional medical care even if the woman were to die. (Conversely, and more to the point for my discussion, a nonviable fetus is one that has not reached that stage of development.) The precise gestational point of viability is, as I understand it, open to some debate within the medical community.

The Kansas Legislature has found that "20 weeks after fertilization," a fetus "reacts to stimuli that would be recognized as painful if applied to an adult human." The finding is codified in K.S.A. 2014 Supp. 65-6722(b). This seems to be a roundabout way of saying a fetus appears to feel pain at 20 weeks' gestation. The statute also refers to unspecified "substantial medical evidence" that a fetus "is capable of experiencing pain" at that stage of gestational development. K.S.A. 2014 Supp. 65-6722(j). The legislature presumably respects its own findings, and the State cannot jettison that finding in arguing the legislative purpose for or governmental interest advanced in Senate Bill 95. Indeed, in K.S.A. 2014 Supp. 65-6722(k), the legislature specifically claims "a compelling state interest in protecting the lives of unborn children" as they reach that developmental stage. But a legislative recitation of compelling interest alone has little legal significance for constitutional purposes. Whether an asserted governmental interest is compelling requires

an independent judicial determination. See *Shaw v. Hunt*, 517 U.S. 899, 908 & n.4, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996) (state "must show" its action furthers a compelling interest); *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1522 (10th Cir. 1994) (whether evidence establishes a compelling interest presents a question of law). Otherwise, legislatures could heavily insulate their enactments from judicial review simply by labeling every statute as serving a "compelling interest" in solving some problem or advancing some policy.

Particularly pertinent here, the State has neither argued prevention of fetal pain as a legislative purpose for Senate Bill 95 nor presented evidence on the issue. At this point, then, for women with pregnancies between 15 and 20 weeks, the D & E procedure aborts nonviable fetuses that no one has shown experience pain. The procedure requires a physician to dissect the fetus within the uterus and to extract the parts through the birth canal. According to Dr. Nauser's affidavit, that usually takes 3 to 10 minutes. Senate Bill 95 effectively prohibits a physician from performing a D & E abortion without first stopping the fetus' heart. The parties have identified three ways of doing so: cutting the umbilical cord or injecting the fetus with either digoxin or potassium chloride. According to the limited information in the district court record, each of those means is invasive, requiring the insertion of surgical instruments or needles that would otherwise be unnecessary.

The umbilical cord may not be easily accessible in some situations, rendering that method difficult or unavailable. The surgical process carries some risk of injuring the woman if the instruments are mishandled. The evidence does not indicate precisely how severing the umbilical cord then causes fetal heart stoppage.

Digoxin and potassium chloride injections effectively induce fetal heart attacks. Potassium chloride appears to be little used in actual practice. In a written statement submitted to the district court, Dr. Anne Davis, M.D., a physician who teaches at

58

Columbia University and treats patients at the school's medical center, stated digoxin injection to be the most common means of inducing fetal heat stoppage for a D & E abortion. She explained the injection is administered 1 or 2 days before the abortion and may not be effective, requiring a second administration of the drug. Other times, however, a digoxin injection may cause the woman to expel the fetus before the procedure and, thus, outside a medical facility. The State has cited medical literature indicating that at least some physicians inducing fetal heart stoppage as part of their D & E protocol do so, in part, because the fetal tissue softens and may be more easily extracted. Dr. Davis, however, stated the limited research on digoxin injection "has not shown medical benefits" in abortion procedures.

In summary, the medical evidence presented to the district court indicates that requiring a physician to stop the fetal heartbeat before performing a D & E abortion increases the invasiveness of the procedure and potential risks to the woman and lengthens the overall process—quite substantially for digoxin injections—with, at best, only nominal clinical benefit. Based on the district court record, a D & E abortion performed before 20 weeks does not implicate possible fetal pain or distress. So that can't be a reasonable justification for requiring fetal heart stoppage before every D & E abortion.

The State's remaining argument rests on the unaesthetic description of a D &E abortion contained in Senate Bill 95 and in *Gonzales v. Carhart*, 550 U.S. 124, 135-36, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007). But aesthetics really cannot justify legislative limitations on safe medical procedures. The lack of justification is even more pronounced when the procedure is integral to a woman's constitutional right to self-determination and reproductive freedom. The government cannot impose upon an essential right because some exercise of the right may be unaesthetic or even repulsive to some people. That's all the more true when those people needn't see or participate in the protected activity.

The legislative history of Senate Bill 95 also fails to establish a clear purpose for the measure, further detracting from the State's argument and any judicial obligation to favor it over a constitutional right. Senate Bill 95 contains no findings or statements of legislative purpose. *Cf.* Pub. L. 108-105 (2003) (extensive congressional findings contained in federal measure banning intact D & E abortions). The House Journal reflects one representative stating he favored Senate Bill 95 because it furthered a governmental interest in protecting "babies" from an inhumane death. Nine other representatives said they wanted to ban abortions and supported Senate Bill 95 as an incremental, though inadequate, step in that direction. House J. 2015, pp. 548-49. Senate Bill 95 passed in the House by a vote of 98 to 26. House J. 2015, p. 548. In the Senate, the measure passed 31 to 9. Senate J. 2015, p. 141. Eleven senators said they voted in favor of Senate Bill 95 because D & E abortion entails a "brutal and inhumane procedure," the continued use of which "will further coarsen society to the humanity of the unborn, as well as all vulnerable and innocent human life." Their statement mirrors one of the congressional findings supporting the ban on intact D & E abortions. Pub. L. 108-105 (2003), codified at 18 U.S.C. § 1531 (2012). None of the other legislators voting for Senate Bill 95 offered an explanation of his or her position.

We, then, have no idea why 108 of the 129 legislators supporting Senate Bill 95 did so. But we do know they chose not to join formally in the officially recorded reasons their colleagues expressed. The State, however, effectively says we ought to take the statements of the 21 legislators—about 16 percent of those supporting Senate Bill 95— combined with the silence of others as reflecting the sense of the majority. But the State's implication seems quite inappropriate. The silent legislators were just that—silent, and their silence conveys no particular message. Many of them simply may have concluded the political implications of voting yes were likely to be considerably less than for voting no. I cannot infer a particular legislative purpose or governmental interest advanced in Senate Bill 95 based on the Senate and House Journals, the source the State has suggested we review.[7]

60

[7]There is no analytical inconsistency in requiring some direct statement of legislative intent for a specific statute, such as Senate Bill 95, and in drawing meaning for § 1 of the Kansas Constitution Bill of Rights from surrounding societal conditions, especially absent an otherwise clear pronouncement from the drafters themselves. Elected politicians approve statutes, typically by the bushel, and stand for reelection on what they have done or failed to do. Intent and purpose may be mixed in those circumstances, since political self-preservation frequently may blend or conflict with loftier policy objectives. In that context, silence rarely can be anything but inscrutable. When the vast majority of legislators are silent about a statute and their support for it, we, as judges reviewing that work, should infer nothing about purpose beyond what the words of the final bill convey. Had Senate Bill 95 included particular findings as to purpose, we could (and likely should) conclude those legislators voting in favor endorsed the findings absent an express disavowal and statement of some alternative reason.

Section 1 and, to some extent, any constitutional provisions protecting individual freedoms against governmental infringement may be viewed differently. A bill of rights stands as a timeless statement of principles. Statutes typically are neither intended to be timeless nor to pronounce broad principles. Rather, they implement particular policies that can be quite mechanical—speed limits on state highways or tax rates on liquor. Legislators may readily refine or alter statutory policies to suit changing needs or shifting political demands. In marked contrast, the delegates to the Wyandotte Convention went there to perform a discrete task, albeit an extraordinarily significant one. When they completed the task, they were done. They faced no popular vote to continue as delegates. Nor were they expected to reconvene to amend their work. Given the nature of their obligation, we may presume the delegates reflected upon the circumstances surrounding them—a climate unlike any other in the country's history—in laying out the principles in the Kansas Constitution Bill of Rights. And we may find indicators of their intent and purpose in those extraordinary circumstances.

The limited evidence presented in the district court and the legislative record offer little in the way of a State interest furthered by Senate Bill 95. Whatever the governmental interest, it would then have to be weighed against the constitutional right of self-determination and the constituent reproductive freedom protected in § 1. This balancing of governmental interest and constitutional protection is uniquely one of Kansas law because § 1 differs from any federal constitutional right. There is no reason to turn to federal abortion law to control or even guide our assessment.

61

The State, acting through its elected and administrative agents, must respect a person's constitutional right of self-determination and the concomitant freedom it bestows. The right by its very description in § 1 has to be considered fundamental—an inalienable right embracing life and liberty could hardly be something less. As such, the courts must subject government action impairing the right to exacting review without deference to any legislative prerogative or presumption of constitutionality. See *Downtown Bar and Grill, LLC v. State*, 294 Kan. 188, 194, 273 P.3d 709 (2012). Even if a statute reflects legislative exercise of police powers, as Senate Bill 95 presumably does, the measure must survive exacting judicial review should it curtail a constitutionally protected fundamental right. *Cf. Manzanares*, 214 Kan. at 600-01 (recognizing heightened review likely applicable when legislature acts under police powers and resulting statute impedes fundamental right); *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458, 108 S. Ct. 2481, 101 L. Ed. 2d 399 (1988) (government interference with individual's "access to" fundamental right "trigger[s] strict scrutiny"). Doing otherwise, in effect, vaults legislation ahead of an elemental constitutional barrier to governmental overreach, undercutting the very purpose of a bill of rights in shielding a select set of fundamental precepts from the vicissitudes of politics and the cravenness of politicians. The State, therefore, gets no thumb on its side of the judicial scale for Senate Bill 95.

At the same time, however, constitutional rights are not impervious to limited legislative constraint in service of a purpose central and necessary to a core function of government. That is, even a fundamental right may be regulated to advance an essential governmental interest, so long as the regulation is carefully circumscribed and does no more than required to advance that interest. The degree of constraint, therefore, must be commensurate with its necessity in advancing that governmental purpose.

By that measure, Senate Bill 95 likely violates § 1 based on the present evidentiary record. The point isn't really even debatable. Under § 1, prohibiting abortion is not itself a proper government purpose. Any limitation or constraint on abortion must further an

established core governmental function, and here the State has the obligation to show how Senate Bill 95 serves such an interest. I am willing to assume prevention of fetal pain rises to that level. But Senate Bill 95 is not carefully circumscribed to further the interest. Consistent with the legislature's own finding, fetuses do not experience pain before 20 weeks' gestation, so requiring fetal heart stoppage in D & E abortions performed in pregnancies before then cannot serve that interest. Causing fetal heart stoppage offers little or no medical benefit to the woman but expands possible risks associated with the procedure and extends its duration. Medical safety, therefore, is not a consideration.

The remaining legislative justification suggested for Senate Bill 95 lies in an aesthetic aversion for the way D & E abortions are done. Regulating medical procedures based on their purported aesthetics is not a core governmental function. It would seem to be no governmental function at all. The availability of entirely different medical procedures for second trimester abortions is irrelevant, since the legislature has simply dictated how D & E abortions must be performed for a reason wholly disassociated from an appropriate governmental objective.

The district court, therefore, acted properly in temporarily enjoining Senate Bill 95 in anticipation of a trial on the merits of the action Drs. Hodes and Nauser have brought. For the reasons I have explained, I would affirm the district court in so ruling.

* * *

MALONE, C.J., dissenting: Derek Schmidt, in his official capacity as the attorney general of Kansas, and Stephen M. Howe, in his official capacity as the district attorney of Johnson County, collectively referred to hereinafter as the State, appeal the district court's order granting a temporary injunction staying the enforcement of the Kansas Unborn Child Protection from Dismemberment Abortion Act ("the Act"). The Act was to

go into effect on July 1, 2015. L. 2015, ch. 22. The plaintiffs, Hodes & Nauser, MDs, P.A., Herbert C. Hodes, M.D., and Traci Lynn Nauser, M.D., filed a petition in Shawnee County District Court seeking declaratory and injunctive relief from the Act. On June 30, 2015, the district court granted a temporary injunction staying enforcement of the Act until further order of the court or until a final judgment is entered in the matter.

In granting the temporary injunction, the district court ruled, for the first time in a Kansas court, that "Sections 1 and 2 of the Bill of Rights of the Kansas Constitution independently protects the fundamental right to abortion." The district court further ruled that "Plaintiffs have established a substantial likelihood of success on their claims that the Act violates their patients' right to abortion protected under Sections 1 and 2 of the Kansas Constitution Bill of Rights." Today, our equally divided court upholds the district court's ruling, with seven judges voting to affirm the district court on both issues, although their reasoning for reaching this result is not the same.

The other seven judges on this court—myself and the six judges who join in this opinion—would hold that the Kansas Constitution does not contain an independent state-law right to abortion. Based on this finding, and because the plaintiffs' claims are brought solely under the Kansas Constitution, it follows that the plaintiffs have failed to establish a substantial likelihood of prevailing on the merits of their claims. Because we have seven votes in favor of affirming the district court's order and seven votes in favor of reversing it, the district court's order granting a temporary injunction is affirmed by an equally divided court. See *Pierce v. Pierce*, 244 Kan. 246, 247, 767 P.2d 292 (1989) (when an appellate court is equally divided, the judgment of the lower court is affirmed).

*The legal battleground over D & E abortions*

This case is about second-trimester dilation and evacuation (D & E) abortions. To fully understand what is at stake in this lawsuit and the constitutional analysis that

follows, it is necessary to summarize various types of abortion procedures. It is also necessary to summarize the current state of federal law relating to D & E abortions.

The most common first-trimester abortion method is vacuum aspiration, otherwise known as suction curettage. In this method, the physician uses a small tube, known as a suction curette, which is attached to a suction apparatus, to empty the uterus. About 90 percent of all abortions performed in the United States take place during the first trimester of pregnancy. *Stenberg v. Carhart*, 530 U.S. 914, 923, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000). The Act does not regulate this procedure.

The most common method of performing a second-trimester abortion is the D & E method. *Stenberg*, 530 U.S. at 924. In a D & E, a physician uses forceps or a similar instrument to remove the fetus, instead of or in conjunction with a suction curette. Usually, disarticulation of the fetus occurs as the physician brings the fetus through the cervix. Stated differently, "[t]he doctor grips a fetal part with the forceps and pulls it back through the cervix and vagina, continuing to pull even after meeting resistance from the cervix. The friction causes the fetus to tear apart." *Gonzales v. Carhart*, 550 U.S. 124, 135, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007). "At the conclusion of a D & E abortion no intact fetus remains. . . . [T]he abortionist is left with 'a tray full of pieces.'" *Stenberg*, 530 U.S. at 959 (Kennedy, J., dissenting) (quoting plaintiff-physician's description of D & E procedure based on record in that case). Although some physicians may induce fetal demise before performing a D & E after 18 weeks gestation, Hodes and Nauser do not take steps to cause fetal demise prior to beginning the D & E procedure.

Another procedure is the "intact D & E" or dilation and extraction (D & X), sometimes called a "partial-birth abortion." In this procedure, after the cervix is dilated, the fetus is removed from the uterus while still intact. While the fetus is still in the mother's body, the physician pierces and collapses the fetus' skull and then removes the fetus. Kansas has a statute banning this procedure. See K.S.A. 2014 Supp. 65-6721.

In *Roe v. Wade*, 410 U.S. 113, 152-53, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), the United States Supreme Court recognized for the first time a right to abortion based in the liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Several years later, in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 877, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (plurality opinion), the Court announced an undue-burden standard courts must apply when considering the constitutionality of abortion regulations. An undue-burden finding, as described in *Casey*, "is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877.

In *Stenberg*, a physician who performed abortions brought suit on behalf of himself and his patients, challenging the constitutionality of a Nebraska statute banning "partial-birth abortion." The case worked its way to the United States Supreme Court, which held that: (1) The statute was unconstitutional because it lacked any exception for the preservation of the health of the mother, and (2) the statute was unconstitutional because it applied to the D & E procedure as well as to the D & X procedure, and thus imposed an undue burden on a woman's ability to choose D & E abortion, thereby unduly burdening the right to choose abortion itself. 530 U.S. at 938, 945-46.

Seven years later, in *Gonzales*, the United States Supreme Court again considered a statute banning a particular method of abortion. The Court again applied the undue-burden test, but this time it upheld the statute—a federal ban on the D & X procedure. 550 U.S. at 133, 146-47, 150-54. The Court found that the government's legitimate interests in showing "its profound respect for the life within the woman" and in protecting the integrity and ethics of the medical profession were rationally furthered by a statute banning a procedure that Congress found was similar to infanticide. 550 U.S. at 157-58. The *Gonzales* Court held that the ban did not have the effect of imposing an undue burden on the right to abortion. Key to this holding was the fact that this statute, unlike

the Nebraska statute in *Stenberg*, clearly banned only the D & X procedure—the D & E procedure remained legal. 550 U.S. at 164.

After *Gonzales*, it appeared that the United States Supreme Court had drawn a clear line: The D & X procedure could be banned, but any statute that attempted to ban the D & E procedure would be unenforceable under the federal Constitution. In 2015, the Kansas Legislature passed the Act which is now before this court. Contrary to Hodes and Nauser's claim, the Act does NOT ban the D & E procedure. Instead, the Act allows a physician to perform a D & E as long as steps are taken to cause fetal demise before dismemberment. See L. 2015, ch. 22, secs. 2-3. Whether those steps impose an undue burden on a patient's right to abortion in Kansas is the focus of the second issue in this case. It appears that the intent of the legislature was that if the D & E must be allowed by law, the only humane method to perform the procedure is to first cause fetal demise. One Kansas senator, joined by 10 others, partially explained his rationale for voting in favor of the Act: "To destroy an unborn child by employing the barbaric and immoral practice of dismemberment is deplorable." Sen. J. 2015, p. 141.

Because Hodes and Nauser do not induce fetal demise before performing a D & E, they claim the Act bans this portion of their practice. Hodes and Nauser filed a petition in Shawnee County District Court seeking declaratory and injunctive relief from the Act. They asked the district court to declare the Act unconstitutional and to enjoin the State from enforcing the Act. But here is where the case takes a different twist. Hodes and Nauser did not assert a claim under the clearly recognized right to abortion found in the United States Constitution. Instead, they asked the district court to find that the Act unconstitutionally inhibits the right to abortion found in the Kansas Constitution.

Based on sparse evidence presented by the plaintiffs and no evidence presented by the State, the district court granted a temporary injunction staying the enforcement of the Act until further order of the court or until final judgment is entered in the matter. In

67

doing so, the district court concluded that "Sections 1 and 2 of the Bill of Rights of the Kansas Constitution independently protects the fundamental right to abortion." The district court also concluded that the plaintiffs had shown a substantial likelihood of success on the merits of their claim that the Act violates their patients' right to abortion protected by the Kansas Constitution. We must address these issues in the same order.

*Does the Kansas Constitution provide an independent state-law right to abortion?*

When analyzing the constitutionality of a statute, courts adhere to certain general principles. First, we "presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. [Citations omitted.]" *Siruta v. Siruta*, 301 Kan. 757, 786, 348 P.3d 549 (2015). The party attacking the statute usually bears the burden to demonstrate its unconstitutionality. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 369, 361 P.3d 504 (2015) (citing *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 102, 169 P.3d 321 [2007]).

Here, the district court erred as a matter of law by finding a "fundamental right" to abortion, thereby subjecting the Act to strict scrutiny and stripping away the presumption of constitutionality. As the United States Supreme Court clarified in *Casey*, abortion regulations are subject to the undue-burden test, which is neither rational-basis review nor strict scrutiny. 505 U.S. at 877. Thus, the Act in question is cloaked with the presumption of constitutionality and the burden is on the plaintiffs to demonstrate otherwise. But before we address the constitutionality of the Act, the threshold question in this appeal is whether the Kansas Constitution recognizes a right to terminate a pregnancy independent of the right grounded in the United States Constitution.

As an initial matter, we address Hodes and Nauser's assertion that our Supreme Court "has consistently held that the liberty and due process protections of Sections 1 and 2 encompass the same rights protected under the Fourteenth Amendment of the Federal Constitution. [Citations omitted.]" If our Supreme Court has truly spoken directly to this

issue, we must follow its holding. See *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 168, 298 P.3d 1120 (2013) (Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication it is departing from previous position).

But all of the cases Hodes and Nauser cite to support their contention are factually and legally distinguishable from the present case. The cases are factually distinguishable because only one of them—*Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 128 P.3d 364 (2006)—deals with abortion rights. The cases are legally distinguishable because most of them address equal protection issues, not due process issues. Most of the cases simply assert, without further explanation, that §§ 1 and 2 of the Kansas Constitution Bill of Rights have much the same effect as the Fourteenth Amendment concerning due process and equal protection. See, *e.g., State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981). Some cases that apply the sections in a due process context analyze procedural due process requirements, not substantive due process. See, *e.g., Board of Reno County Comm'rs v. Akins*, 271 Kan. 192, 197, 21 P.3d 535 (2001). Although some cases analyze substantive due process under § 18 of the Kansas Constitution Bill of Rights, Hodes and Nauser have not asserted § 18 as a basis for an independent right to abortion. See *Siruta*, 301 Kan. at 774 (recognizing general rule that a party waives an argument by failing to brief it).

Most importantly, in the one case that the Kansas Supreme Court was asked to address the precise constitutional question before this court today, our Supreme Court declined to reach the issue. Both parties acknowledge that our Supreme Court explicitly stated in 2006 that it had "not previously recognized—and need not recognize in this case despite petitioners' invitation to do so—that [a pregnant woman's right to obtain an abortion] also exist[s] under the Kansas Constitution." See *Alpha Med. Clinic*, 280 Kan. at 920. Although the court went on to note that it customarily interprets the Kansas Constitution "to echo federal standards," *Alpha* is not controlling on the issues before us today. 280 Kan. at 920. Thus, without binding precedent from our Supreme Court, we

must proceed to answer the question of whether the Kansas Constitution provides a right to abortion independent of the right found in the United States Constitution.

Our Supreme Court has recognized that the Kansas Constitution and the United States Constitution are distinct documents susceptible to distinct interpretation. See *State v. Lawson*, 296 Kan. 1084, 1090-93, 297 P.3d 1164 (2013). "In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision." *State ex rel. Stephan v. Finney*, 254 Kan. 632, 654, 867 P.2d 1034 (1994); *In re Tax Exemption Application of Kaul*, 261 Kan. 755, 765, 933 P.2d 717 (1997). As long ago as 1876 and as recently as 2014, our Supreme Court has recognized the vital importance of determining the intent of the framers of constitutional language when interpreting constitutional provisions:

> "'"[T]he best and only safe rule for ascertaining the intention of the makers of any written law[] is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing."'" *Gannon v. State*, 298 Kan. 1107, 1143, 319 P.3d 1196 (2014) (quoting *Wright v. Noell*, 16 Kan. 601, 607 [1876]).

We must adhere to this long-standing principle even when interpreting language in the Kansas Constitution which arguably corresponds to a provision in the United States constitution. Although the Kansas Supreme Court traditionally has not interpreted our state constitution differently than the United States Constitution, it has the right to do so. See *Lawson*, 296 Kan. at 1090-93; *State v. Scott*, 286 Kan. 54, 93, 183 P.3d 801 (2008) ("'[W]e have the right to interpret our Kansas Constitution in a manner different than the United States Constitution has been construed.'"). Crucial to correctly applying this precept is recognizing that coextensive interpretation of provisions of the Kansas and United States Constitutions is appropriate only when the provisions themselves are similar. See *State v. Schoonover*, 281 Kan. 453, 493, 133 P.3d 48 (2006) ("Generally,

70

provisions of the Kansas Constitution *which are similar* to the Constitution of the United States have been applied in a similar manner." [Emphasis added.]).

For example, the Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Section 15 of the Kansas Constitution Bill of Rights provides:

"The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or property to be seized."

Clearly, the search and seizure provisions of the Kansas and United States Constitutions are similar. Thus, it is no surprise that our Supreme Court has long held that they provide the same rights and protections. See, *e.g.*, *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). Our Supreme Court has also held coextensive other similar provisions in the Kansas and United States Constitutions. See, *e.g., State v. Hensley*, 298 Kan. 422, 435, 313 P.3d 814 (2013) (noting that although the language of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights are not identical, they are similar and have been interpreted as providing the same protection against double jeopardy); *Scott*, 286 Kan. at 93 ("'The wording of [the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights] is nearly identical, and we will look to constructions of both provisions in reaching our conclusions herein.'"); *State v. Busse*, 231 Kan. 108, 110-11, 642 P.2d 972 (1982) (quoting similarly worded provisions of Sixth Amendment to the United States

71

Constitution and § 10 of the Kansas Constitution Bill of Rights and stating that the rights in each are satisfied by the same opportunity for confrontation).

On the other hand, there are also instances in which the Kansas Constitution has provided rights and protections different from those provided in the United States Constitution. For example, § 6 of the Kansas Constitution Bill of Rights states: "There shall be no slavery in this state; and no involuntary servitude, except for the punishment of crime, whereof the party shall have been duly convicted." Section 6 was ratified in 1859 and enacted along with the rest of the original Kansas Constitution in 1861. See L. 1861, p. 48; Wyandotte Constitutional Convention, pp. 574-75 (1920). When our state constitution was adopted, slavery was not addressed in the United States Constitution and it was legal in many states. The majority of the framers of the Kansas Constitution abhorred slavery and wanted Kansas to be a free state, so they drafted the constitution to ban slavery in plain and unambiguous terms in order to accomplish their intent.

Moreover, the fact that a prohibition exists in the United States Constitution does not necessarily mean that it also must independently exist somewhere in the Kansas Constitution. The Supremacy Clause of the United States Constitution "invalidates state laws that interfere with, or are contrary to, federal law." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011). It does not require that state constitutions must be interpreted as conferring rights identical to the federal Constitution because failing to guarantee a right is not the same as interfering with or running contrary to a federal guarantee of that right. Practically speaking, the absence in a state constitution of a right nonetheless guaranteed by the federal Constitution will have no effect on a party's ability to seek redress if the right is violated, as any aggrieved party may pursue relief under the United States Constitution.

On the issue of abortion rights, the provision of the federal Constitution implicated is the liberty interest found in the Due Process Clause of the Fourteenth Amendment. See

*Casey*, 505 U.S. at 846; *Roe*, 410 U.S. at 152-53. Hodes and Nauser assert that §§ 1 and 2 of the Kansas Constitution Bill of Rights provide at least the same right to abortion as is guaranteed by the Fourteenth Amendment to the United States Constitution. Under the analysis courts have traditionally used, if the Fourteenth Amendment is sufficiently similar to §§ 1 and 2 of the Kansas Constitution Bill of Rights, we will accede to the plaintiffs' request and find the provisions coextensive. In ascertaining the meaning of a constitutional provision, Kansas courts apply a textual and historical approach in order to give effect to the intent of its framers. See *State ex rel. Stephan*, 254 Kan. at 654.

We first look to the language of the textual provisions. Section 1 of the Fourteenth Amendment states, in pertinent part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Section 1 of the Kansas Constitution Bill of Rights states: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." This language is taken from the Declaration of Independence. Wyandotte Constitutional Convention, pp. 678-79. Initially, by simply examining the plain language of the two provisions, we note that the language of § 1 of the Kansas Constitution Bill of Rights is not the same as the language of the Fourteenth Amendment. Section 1 of the Kansas Constitution Bill of Rights does not mention due process of law—the precise clause in the Fourteenth Amendment that recognizes a right to abortion. Moreover, § 1 does not include language such as "[n]o State shall . . . deprive" any person of rights or privileges without due process of law—language that might trigger substantive rights under the provision. See U.S. Const. amend. XIV, § 1. Arguably, the Kansas Constitution contains no clearly identified substantive due process clause. At least one Kansas district

court has examined § 1 closely and concluded that its framers did not intend it to "'furnish a basis for the judicial determination of specific controversies.'" *State ex rel. Kline v. Sebelius*, No. 05-C-1050, 2006 WL 237113, *12 (Kan. 3d Jud. Dist. Ct. January 24, 2006) (quoting *Schaake v. Dolley*, 85 Kan. 598, 601, 118 Pac. 80 [1911]).

Section 2 of the Kansas Constitution Bill of Rights states:

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

Section 2 focuses on political power and a prohibition against special privileges and immunities. It contains language similar to the Fourteenth Amendment regarding equal protection, and our Supreme Court has long cited and applied §§ 1 and 2 in equal protection analysis. See *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005); *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 759, 408 P.2d 877 (1965); *Winters v. Myers*, 92 Kan. 414, 421, 140 Pac. 1033 (1914). Like § 1, however, § 2 does not contain any due process protections of the right to liberty similar to the language in the Due Process Clause of the Fourteenth Amendment.

We conclude that the plain language of §§ 1 and 2 of the Kansas Constitution Bill of Rights is not similar enough to the language of the Fourteenth Amendment to find that the corresponding provisions must be applied in the same manner. Stated differently, although Kansas courts generally interpret provisions of our Kansas Constitution the same as the United States Supreme Court's interpretation of corresponding provisions of the United States Constitution, we remain unconvinced that the language of §§ 1 and 2 of the Kansas Constitution Bill of Rights is sufficiently similar to the language of the Fourteenth Amendment to justify coextensive interpretation.

74

We next look to the history of §§ 1 and 2 of the Kansas Constitution Bill of Rights for additional information on the framers' intent. The Kansas Constitution was adopted at the Wyandotte Constitutional Convention on July 29, 1859, and was ratified on October 4, 1859, by a vote of 10,421 in favor and 5,530 against. Revisor's Note to the Constitution of the State of Kansas, p. 13. As the State points out, at the time §§ 1 and 2 of the Kansas Constitution Bill of Rights were ratified, abortion was criminalized in Kansas. In fact, the Territorial Legislature had outlawed certain types of abortion even prior to Kansas obtaining statehood. See Kan. Terr. Stat. 1855, ch. 48, §§ 9-10. The first Kansas Legislature adopted identical provisions, and statutes broadly criminalizing abortion except when required to save the mother's life in the face of an emergency existed until 1970. See K.S.A. 21-3407 (Weeks); G.L. 1862, ch. 33, §§ 9-10.

Additionally, the Fourteenth Amendment was proposed in 1866 and ratified in 1868, whereas §§ 1 and 2 of the Kansas Constitution Bill of Rights were ratified in 1859, 7 years before Congressional debates over the Fourteenth Amendment began and 9 years prior to the Fourteenth Amendment's ratification. See Wildenthal, *Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866-67*, 68 Ohio St. L.J. 1509, 1539 (2007) (discussing first proposal of Fourteenth Amendment); Wyandotte Constitutional Convention, pp. 574-75. Clearly, the framers of the Kansas Constitution could not have consciously intended to create rights coextensive with the rights under the then-nonexistent Fourteenth Amendment.

Hodes and Nauser contend that we should interpret §§ 1 and 2 to encompass a right to abortion because § 1 acknowledges the inalienable natural right to liberty. We assume this is because the United States Supreme Court in *Roe* grounded its recognition of a woman's right to terminate her pregnancy in "the Fourteenth Amendment's concept of personal liberty and restrictions upon state action." 410 U.S. at 153. But to accept such a broad reading of § 1 of the Kansas Constitution Bill of Rights, which does not contain

the same language as the Fourteenth Amendment and was ratified under different historical circumstances, would go well beyond the apparent intent of its framers.

The judges on this court who vote to affirm the district court, or at least most of them, conclude that §§ 1 and 2 of the Kansas Constitution Bill of Rights provide the same protection for abortion rights as the Due Process Clause of the Fourteenth Amendment. This conclusion is premised on the finding that the language of §§ 1 and 2 of the Kansas Constitution Bill of Rights is sufficiently equivalent to the Due Process Clause of the Fourteenth Amendment to justify coextensive interpretation. But this premise is flawed because a comparison of the plain language of the two separate constitutions reveals important differences. Our Kansas Supreme Court decisions that have stated the general proposition that §§ 1 and 2 of the Kansas Constitution Bill of Rights have much the same effect as the Fourteenth Amendment concerning due process and equal protection are factually and legally distinguishable from this case and fail to support the ultimate conclusion that the Kansas Constitution recognizes a right to abortion.

Judge Atcheson's concurring opinion agrees with our conclusion that there are important differences between §§ 1 and 2 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment to the federal Constitution and that the two instruments should be interpreted differently. But Judge Atcheson goes on to find that § 1 of the Kansas Constitution Bill of Rights provides even greater protection for abortion rights than is provided by the Fourteenth Amendment. We believe that such a broad reading of § 1 of the Kansas Constitution Bill of Rights is not supported either by the plain language of the provision or by the historical circumstances under which it was adopted.

To begin to wrap up, "[i]n ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision." *State ex rel. Stephan*, 254 Kan. at 654. This means that courts must do their best to ascertain the intention of the delegates at the Wyandotte Constitutional

Convention who drafted our state constitution and the Kansas territorial voters who ratified the instrument in 1859. That is not always an easy task to accomplish over 150 years after the fact. But the question we need to ask and answer is not what rights today's judges would like to see in our state constitution. The proper question to ask and answer is what rights the makers and adopters of the instrument intended to protect.

Simply put, there is nothing within the text or history of §§ 1 and 2 of the Kansas Constitution Bill of Rights to lead this court to conclude that these provisions were intended to guarantee a right to abortion. Kansas courts are authorized to interpret our state constitution in a manner different than the United States Constitution has been construed, and we should do so when appropriate. Our state's founders held sacred the basic concepts of life, liberty, and the pursuit of happiness, and they expressed those sentiments in that order in § 1 of our Bill of Rights. Even if Kansas courts were to find substantive due process rights under § 1, as opposed to a mere expression of traditional beliefs, we would not find a substantive due process right to abortion.

The subject of abortion places the pregnant woman's liberty interest directly at odds with the unborn child's right to life. The balancing of these interests is a question of public policy. Our state legislature, not an intermediate court of appeals, is the branch of government charged with the development of public policy on behalf of Kansas citizens. Because the Kansas Constitution provides no substantive due process right to abortion, our legislature is free to restrict abortion procedures to the extent it finds it appropriate— as long as the legislative act does not violate our federal Constitution. This is consistent with the democratic process by which we govern ourselves.

Hodes and Nauser are asking this court to amend the Kansas Constitution to include by inference a right to abortion that is not expressly found in the text of the document. Article 14 of our state constitution provides a process for amendments to be proposed by the legislature and approved by the electors, and our constitution has been

77

amended many times since it was originally adopted. "The Kansas Constitution is the work of the people." *Gannon*, 298 Kan. 1107, Syl. ¶ 1. If Kansans want to amend our constitution to include a state-law right to abortion, they may do so properly under Article 14; it should not be done by judicial decree.

As Hodes and Nauser are fully aware, if they desire to seek judicial relief from the Act for themselves and their patients, they are free to invoke the protections of the federal Constitution. The plaintiffs are not without a legal remedy even if Kansas courts deny their request to find a state-law right to abortion. As stated in their brief: "[T]he United States Supreme Court has already balanced the precise issue before this Court, striking down a ban on D & E, the very procedure banned by the Act, as unconstitutional." In addition to the fact that our state constitution does not speak directly to the subject of abortion, another reason Kansas courts should decline the plaintiffs' request to find a right to abortion in the Kansas Constitution is simply because it is unnecessary for Kansas courts to do so. The citizens of Kansas, including Hodes and Nauser and their patients, are unequivocally protected by the Due Process Clause of the Fourteenth Amendment, as interpreted by the United States Supreme Court. For the sake of consistency alone, we should leave it there rather than entangling our state courts into this arena which has divided our nation for over 40 years.

In closing, the judges who join in this opinion would hold that the Act is not prohibited by §§ 1 and 2 of the Kansas Constitution Bill of Rights. Because we would hold that §§ 1 and 2 of the Kansas Constitution Bill of Rights do not provide an independent state-law right to abortion, we need not reach the question of whether the Act unconstitutionally hinders the exercise of that right.

GREEN, HILL, BRUNS, POWELL, SCHROEDER, AND GARDNER, JJ., join in the foregoing opinion.